## ILLINOIS *v.* KRULL ET AL.

No. 85–608. Argued November 5, 1986—Decided March 9, 1987

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, and SCALIA, JJ., joined. MARSHALL, J., filed a dissenting opinion, *post*, p. 361. O'CONNOR, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 361.

*Michael J. Angarola* argued the cause for petitioner. On the brief were *Neil F. Hartigan*, Attorney General of Il-

linois, *Roma J. Stewart,* Solicitor General, and *Mark L. Rotert,* Assistant Attorney General.

*Paul J. Larkin, Jr.,* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Fried, Assistant Attorney General Trott, Deputy Solicitor General Bryson, Andrew J. Pincus,* and *Robert J. Erickson.*

*Miriam F. Miquelon* argued the cause for respondents. With her on the brief was *Louis B. Garippo.*\*

JUSTICE BLACKMUN delivered the opinion of the Court.

In *United States* v. *Leon,* 468 U. S. 897 (1984), this Court ruled that the Fourth Amendment exclusionary rule does not apply to evidence obtained by police officers who acted in objectively reasonable reliance upon a search warrant issued by a neutral magistrate, but where the warrant was ultimately found to be unsupported by probable cause. See also *Massachusetts* v. *Sheppard,* 468 U. S. 981 (1984). The present case presents the question whether a similar exception to the exclusionary rule should be recognized when officers act in objectively reasonable reliance upon a *statute* authorizing warrantless administrative searches, but where the statute is ultimately found to violate the Fourth Amendment.

I

The State of Illinois, as part of its Vehicle Code, has a comprehensive statutory scheme regulating the sale of motor vehicles and vehicular parts. See Ill. Rev. Stat., ch. 95½, ¶¶ 5–100 to 5–801 (1985). A person who sells motor vehicles, or deals in automotive parts, or processes automotive scrap metal, or engages in a similar business must obtain a license from the Illinois Secretary of State. ¶¶ 5–101, 5–102, 5–301.

---

\**Robert K. Corbin,* Attorney General of Arizona, *Daniel B. Hales, James A. Murphy, Jack E. Yelverton, Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak* filed a brief for the State of Arizona et al. as *amici curiae* urging reversal.

A licensee is required to maintain a detailed record of all motor vehicles and parts that he purchases or sells, including the identification numbers of such vehicles and parts, and the dates of acquisition and disposition. ¶ 5–401.2. In 1981, the statute in its then form required a licensee to permit state officials to inspect these records "at any reasonable time during the night or day" and to allow "examination of the premises of the licensee's established place of business for the purpose of determining the accuracy of required records." Ill. Rev. Stat., ch. 95½, ¶ 5–401(e) (1981).[1]

Respondents in 1981 operated Action Iron & Metal, Inc., an automobile wrecking yard located in the city of Chicago. Detective Leilan K. McNally of the Chicago Police Department regularly inspected the records of wrecking yards pursuant to the state statute. Tr. 12.[2] On the morning of July 5, 1981, he entered respondents' yard. *Id.*, at 7. He identified himself as a police officer to respondent Lucas, who was working at the yard, and asked to see the license and records of vehicle purchases. Lucas could not locate the license or records, but he did produce a paper pad on which approximately five vehicle purchases were listed. *Id.*, at 25–26. McNally then requested and received permission from Lucas to look at the cars in the yard. Upon checking with his mobile computer the serial numbers of several of the vehicles, McNally ascertained that three of them were stolen. Also, the identification number of a fourth had been removed. McNally seized the four vehicles and placed Lucas under arrest. *Id.*, at 8–9, 16–17. Respondent Krull, the holder of the license, and respondent Mucerino, who was present at the yard the day of the search, were arrested later. Re-

---

[1] Paragraph 5–401 of the 1981 compilation was repealed by 1983 Ill. Laws No. 83–1473, § 2, effective Jan. 1, 1985. Its current compilation replacement bears the same paragraph number.

[2] Citations to the transcript refer to the Sept. 25, 1981, hearing on respondents' suppression motion held in the Circuit Court of Cook County. 2 Record 24.

spondents were charged with various criminal violations of the Illinois motor vehicle statutes.

The state trial court (the Circuit Court of Cook County) granted respondents' motion to suppress the evidence seized from the yard. App. 20–21. Respondents had relied on a federal-court ruling, issued the day following the search, that ¶5–401(e), authorizing warrantless administrative searches of licensees, was unconstitutional. See *Bionic Auto Parts & Sales, Inc.* v. *Fahner*, 518 F. Supp. 582 (ND Ill. 1981), aff'd in part, vacated in part, and remanded in part, 721 F. 2d 1072 (CA7 1983). The Federal District Court in that case had concluded that the statute permitted officers unbridled discretion in their searches and was therefore not "'a constitutionally adequate substitute for a warrant.'" 518 F. Supp., at 585–586, quoting *Donovan* v. *Dewey*, 452 U. S. 594, 603 (1981). The state trial court in the instant case agreed that the statute was invalid and concluded that its unconstitutionality "affects all pending prosecutions not completed." App. 20. On that basis, the trial court granted respondents' motion to suppress the evidence. *Id.*, at 20–21.[3]

The Appellate Court of Illinois, First Judicial District, vacated the trial court's ruling and remanded the case for further proceedings. *Id.*, at 22. It observed that recent developments in the law indicated that Detective McNally's good-faith reliance on the state statute might be relevant in assessing the admissibility of evidence, but that the trial court should first make a factual determination regarding McNally's good faith. *Id.*, at 25. It also observed that the trial court might wish to reconsider its holding regarding the unconstitutionality of the statute in light of the decision by the United States Court of Appeals for the Seventh Circuit upholding the amended form of the Illinois statute. See *Bionic Auto Parts & Sales, Inc.* v. *Fahner*, 721 F. 2d 1072

---

[3] The trial court also concluded that Lucas had not consented to the search. App. 20. That ruling is not now at issue here.

(CA7 1983).[4] On remand, however, the state trial court adhered to its decision to grant respondents' motion to suppress. It stated that the relevant statute was the one in effect at the time McNally searched respondents' yard, and that this statute was unconstitutional for the reasons stated by the Federal District Court in *Bionic*. It further concluded that because the good faith of an officer is relevant, if at all, only when he acts pursuant to a warrant, Detective McNally's possible good-faith reliance upon the statute had no bearing on the case. App. 32–35.[5]

The Supreme Court of Illinois affirmed.[6] 107 Ill. 2d 107, 481 N. E. 2d 703 (1985). It first ruled that the state statute, as it existed at the time McNally searched respondents' yard, was unconstitutional. It noted that statutes authorizing warrantless administrative searches in heavily regulated industries had been upheld where such searches were necessary to promote enforcement of a substantial state interest, and where the statute " 'in terms of [the] certainty and regularity of its application, provide[d] a constitutionally adequate substitute for a warrant.' " *Id.*, at 116, 481 N. E. 2d, at 707, quoting *Donovan* v. *Dewey*, 452 U. S., at 603. Although acknowledging that the statutory scheme authorizing

---

[4] Following the decision of the District Court in *Bionic Auto Parts & Sales, Inc.* v. *Fahner*, 518 F. Supp. 582 (ND Ill. 1981), the Illinois Legislature amended the statute to limit the timing, frequency, and duration of the administrative search. 1982 Ill. Laws No. 82–984, codified, as amended, at Ill. Rev. Stat., ch. 95½, ¶ 5–403 (1985). See n. 1, *supra*. On appeal, the Court of Appeals for the Seventh Circuit did not address the validity of the earlier form of the statute, for it held that the amended statute satisfied the requirements of the Fourth Amendment. See *Bionic Auto Parts & Sales, Inc.* v. *Fahner*, 721 F. 2d 1072, 1075 (1983).

[5] The trial court also indicated that McNally may have acted outside the scope of his statutory authority when he examined vehicles other than those listed on the pad offered by Lucas. App. 29; 5 Record 2, 8.

[6] The State bypassed the Illinois intermediate appellate court and appealed directly to the Supreme Court of Illinois pursuant to Illinois Supreme Court Rule 603.

warrantless searches of licensees furthered a strong public interest in preventing the theft of automobiles and the trafficking in stolen automotive parts, the Illinois Supreme Court concluded that the statute violated the Fourth Amendment because it "vested State officials with too much discretion to decide who, when, and how long to search." 107 Ill. 2d, at 116, 481 N. E. 2d, at 707.

The court rejected the State's argument that the evidence seized from respondents' wrecking yard should nevertheless be admitted because the police officer had acted in good-faith reliance on the statute authorizing such searches. The court observed that in *Michigan* v. *DeFillippo*, 443 U. S. 31 (1979), this Court had upheld an arrest and search made pursuant to an ordinance defining a criminal offense, where the ordinance was subsequently held to violate the Fourth Amendment. The Illinois court noted that this Court in *DeFillippo* had contrasted the ordinance then before it, defining a substantive criminal offense, with a procedural statute directly authorizing searches without a warrant or probable cause, and had stated that evidence obtained in searches conducted pursuant to the latter type of statute traditionally had not been admitted. 107 Ill. 2d, at 118, 481 N. E. 2d, at 708. Because the Illinois statute did not define a substantive criminal offense, but, instead, was a procedural statute directly authorizing warrantless searches, the Illinois Supreme Court concluded that good-faith reliance upon that statute could not be used to justify the admission of evidence under an exception to the exclusionary rule. *Id.*, at 118–119, 481 N. E. 2d, at 708.

We granted certiorari, 475 U. S. 1080 (1986), to consider whether a good-faith exception to the Fourth Amendment exclusionary rule applies when an officer's reliance on the constitutionality of a statute is objectively reasonable, but the statute is subsequently declared unconstitutional.

## II

## A

When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure. *Weeks* v. *United States*, 232 U. S. 383 (1914); *Mapp* v. *Ohio*, 367 U. S. 643 (1961). The Court has stressed that the "prime purpose" of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States* v. *Calandra*, 414 U. S. 338, 347 (1974). Application of the exclusionary rule "is neither intended nor able to 'cure the invasion of the defendant's rights which he has already suffered.'" *United States* v. *Leon*, 468 U. S., at 906, quoting *Stone* v. *Powell*, 428 U. S. 465, 540 (1976) (WHITE, J., dissenting). Rather, the rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" 468 U. S., at 906, quoting *United States* v. *Calandra*, 414 U. S., at 348.

As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced. Thus, in various circumstances, the Court has examined whether the rule's deterrent effect will be achieved, and has weighed the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process. See, *e. g., United States* v. *Janis*, 428 U. S. 433, 454 (1976) (evidence obtained by state officers in violation of Fourth Amendment may be used in federal civil proceeding because likelihood of deterring conduct of state officers does not outweigh societal costs imposed by exclusion); *United States* v. *Calandra*, 414 U. S., at 351–352 (evidence obtained in contravention of Fourth Amendment may be used in grand jury proceedings because minimal advance in deterrence of police

misconduct is outweighed by expense of impeding role of grand jury).

In *Leon,* the Court held that the exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was objectively reasonable, even though the warrant was ultimately found to be defective. On the basis of three factors, the Court concluded that there was no sound reason to apply the exclusionary rule as a means of deterring misconduct on the part of judicial officers who are responsible for issuing warrants. First, the exclusionary rule was historically designed "to deter police misconduct rather than to punish the errors of judges and magistrates." 468 U. S., at 916. Second, there was "no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *Ibid.* Third, and of greatest importance to the Court, there was no basis "for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." *Ibid.* The Court explained: "Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions." *Id.,* at 917. Thus, the threat of exclusion of evidence could not be expected to deter such individuals from improperly issuing warrants, and a judicial ruling that a warrant was defective was sufficient to inform the judicial officer of the error made.

The Court then considered whether application of the exclusionary rule in that context could be expected to alter the behavior of law enforcement officers. In prior cases, the Court had observed that, because the purpose of the exclusionary rule is to deter police officers from violating the Fourth Amendment, evidence should be suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the

search was unconstitutional under the Fourth Amendment." *United States* v. *Peltier*, 422 U. S. 531, 542 (1975); see also *Michigan* v. *Tucker*, 417 U. S. 433, 447 (1974). Where the officer's conduct is objectively reasonable, the Court explained in *Leon*,

> "'[e]xcluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.'" *United States* v. *Leon*, 468 U. S., at 920, quoting *Stone* v. *Powell*, 428 U. S., at 539–540 (WHITE, J., dissenting).

The Court in *Leon* concluded that a deterrent effect was particularly absent when an officer, acting in objective good faith, obtained a search warrant from a magistrate and acted within its scope. "In most such cases, there is no police illegality and thus nothing to deter." 468 U. S., at 920–921. It is the judicial officer's responsibility to determine whether probable cause exists to issue a warrant, and, in the ordinary case, police officers cannot be expected to question that determination. Because the officer's sole responsibility after obtaining a warrant is to carry out the search pursuant to it, applying the exclusionary rule in these circumstances could have no deterrent effect on a future Fourth Amendment violation by the officer. *Id.*, at 921.

## B

The approach used in *Leon* is equally applicable to the present case. The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an

officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written. To paraphrase the Court's comment in *Leon:* "Penalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Ibid.*[7]

Any difference between our holding in *Leon* and our holding in the instant case, therefore, must rest on a difference between the effect of the exclusion of evidence on judicial officers and the effect of the exclusion of evidence on legislators. Although these two groups clearly serve different functions in the criminal justice system, those differences are not controlling for purposes of this case. We noted in *Leon* as an initial matter that the exclusionary rule was aimed at deterring police misconduct. 468 U. S., at 916. Thus, legislators, like judicial officers, are not the focus of the rule. Moreover, to the extent we consider the rule's effect on legislators, our initial inquiry, as set out in *Leon*, is whether there is evidence to suggest that legislators "are inclined to ignore or subvert the Fourth Amendment." *Ibid.* Although legislators are not "neutral judicial officers," as are judges and magistrates, *id.*, at 917, neither are they "adjuncts to the

---

[7] Indeed, the possibility of a deterrent effect may be even less when the officer acts pursuant to a statute rather than a warrant. In *Leon*, the Court pointed out: "One could argue that applying the exclusionary rule in cases where the police failed to demonstrate probable cause in the warrant application deters future inadequate presentations or 'magistrate shopping' and thus promotes the ends of the Fourth Amendment." 468 U. S., at 918. Although the Court in *Leon* dismissed that argument as speculative, *ibid.*, the possibility that a police officer might modify his behavior does not exist at all when the officer relies on an existing statute that authorizes warrantless inspections and does not require any preinspection action, comparable to seeking a warrant, on the part of the officers.

law enforcement team." *Ibid.* The role of legislators in the criminal justice system is to enact laws for the purpose of establishing and perpetuating that system. In order to fulfill this responsibility, legislators' deliberations of necessity are significantly different from the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). Before assuming office, state legislators are required to take an oath to support the Federal Constitution. See U. S. Const., Art. VI, cl. 3. Indeed, by according laws a presumption of constitutional validity, courts presume that legislatures act in a constitutional manner. See *e. g.*, *McDonald* v. *Board of Election Comm'rs of Chicago*, 394 U. S. 802, 808–809 (1969); see generally 1 N. Singer, Sutherland on Statutory Construction § 2.01 (4th ed. 1985).

There is no evidence suggesting that Congress or state legislatures have enacted a significant number of statutes permitting warrantless administrative searches violative of the Fourth Amendment. Legislatures generally have confined their efforts to authorizing administrative searches of specific categories of businesses that require regulation, and the resulting statutes usually have been held to be constitutional. See, *e. g.*, *Donovan* v. *Dewey*, 452 U. S. 594 (1981); *United States* v. *Biswell*, 406 U. S. 311 (1972); *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970); *United States* v. *Jamieson-McKames Pharmaceuticals, Inc.*, 651 F. 2d 532 (CA8 1981), cert. denied, 455 U. S. 1016 (1982); see also 3 W. LaFave, Search and Seizure § 10.2, pp. 132–134, n. 89.1 (Supp. 1986) (collecting cases). Thus, we are given no basis for believing that legislators are inclined to subvert their oaths and the Fourth Amendment and that "lawlessness among these actors requires application of the extreme sanction of exclusion." *United States* v. *Leon*, 468 U. S., at 916.

Even if we were to conclude that legislators are different in certain relevant respects from magistrates, because legislators are not officers of the judicial system, the next inquiry

necessitated by *Leon* is whether exclusion of evidence seized pursuant to a statute subsequently declared unconstitutional will "have a significant deterrent effect," *ibid.*, on legislators enacting such statutes. Respondents have offered us no reason to believe that applying the exclusionary rule will have such an effect. Legislators enact statutes for broad, programmatic purposes, not for the purpose of procuring evidence in particular criminal investigations. Thus, it is logical to assume that the greatest deterrent to the enactment of unconstitutional statutes by a legislature is the power of the courts to invalidate such statutes. Invalidating a statute informs the legislature of its constitutional error, affects the admissibility of all evidence obtained subsequent to the constitutional ruling, and often results in the legislature's enacting a modified and constitutional version of the statute, as happened in this very case. There is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to the statute prior to the declaration of its invalidity will act as a significant, additional deterrent.[8] Moreover, to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the "substantial social costs exacted by the exclusion-

---

[8] It is possible, perhaps, that there are some legislators who, for political purposes, are possessed with a zeal to enact a particular unconstitutionally restrictive statute, and who will not be deterred by the fact that a court might later declare the law unconstitutional. But we doubt whether a legislator possessed with such fervor, and with such disregard for his oath to support the Constitution, would be significantly deterred by the possibility that the exclusionary rule would preclude the introduction of evidence in a certain number of prosecutions. Moreover, and of equal importance, just as we were not willing to assume in *Leon* that the possibility of magistrates' acting as "rubber stamps for the police" was a problem of major proportions, see 468 U. S., at 916, n. 14, we are not willing to assume now that there exists a significant problem of legislators who perform their legislative duties with indifference to the constitutionality of the statutes they enact. If future empirical evidence ever should undermine that assumption, our conclusions may be revised accordingly. See *United States* v. *Leon*, 468 U. S., at 927–928 (concurring opinion).

ary rule." *Id.*, at 907.[9] When we indulge in such weighing, we are convinced that applying the exclusionary rule in this context is unjustified.

Respondents argue that the result in this case should be different from that in *Leon* because a statute authorizing warrantless administrative searches affects an entire industry and a large number of citizens, while the issuance of a defective warrant affects only one person. This distinction is not persuasive. In determining whether to apply the exclusionary rule, a court should examine whether such application will advance the deterrent objective of the rule. Although the number of individuals affected may be considered when "weighing the costs and benefits," *ibid.*, of applying the exclusionary rule, the simple fact that many are affected by a statute is not sufficient to tip the balance if the deterrence of Fourth Amendment violations would not be advanced in any meaningful way.[10]

We also do not believe that defendants will choose not to contest the validity of statutes if they are unable to benefit directly by the subsequent exclusion of evidence, thereby resulting in statutes that evade constitutional review. First, in *Leon*, we explicitly rejected the argument that the good-faith exception adopted in that case would "preclude review

---

[9] In *Leon*, the Court pointed out: "An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains." *Id.*, at 907.

[10] Moreover, it is not always true that the issuance of defective warrants will affect only a few persons. For example, it is possible that before this Court's rather controversial decision in *Aguilar* v. *Texas*, 378 U. S. 108 (1964), see *Illinois* v. *Gates*, 462 U. S. 213, 238, and n. 11 (1983), a number of magistrates believed that probable cause could be established solely on the uncorroborated allegations of a police officer and a significant number of warrants may have been issued on that basis. Until that view was adjusted by this Court's ruling, many persons may have been affected by the systematic granting of warrants based on erroneous views of the standards necessary to establish probable cause.

of the constitutionality of the search or seizure" or would cause defendants to lose their incentive to litigate meritorious Fourth Amendment claims. We stated that "the magnitude of the benefit conferred on defendants by a successful [suppression] motion makes it unlikely that litigation of colorable claims will be substantially diminished." *Id.*, at 924, and n. 25. In an effort to suppress evidence, a defendant has no reason not to argue that a police officer's reliance on a warrant or statute was not objectively reasonable and therefore cannot be considered to have been in good faith. Second, unlike a person searched pursuant to a warrant, a person subject to a statute authorizing searches without a warrant or probable cause may bring an action seeking a declaration that the statute is unconstitutional and an injunction barring its implementation. Indeed, that course of action was followed with respect to the statute at issue in this case. Several businesses brought a declaratory judgment suit in Federal District Court challenging ¶5–401(e) of the Illinois Vehicle Code (1981), and the provision was declared unconstitutional. See *Bionic Auto Parts & Sales, Inc.* v. *Fahner*, 518 F. Supp., at 585. Subsequent to that declaration, respondents, in their state-court criminal trial, challenged the admissibility of evidence obtained pursuant to the statute. App. 13–17.[11]

---

[11] Other plaintiffs have challenged state statutes on Fourth Amendment grounds in declaratory judgment actions. See *California Restaurant Assn.* v. *Henning*, 173 Cal. App. 3d 1069, 219 Cal. Rptr. 630 (1985) (organization of restaurant owners challenged constitutionality of state statute vesting authority in State Labor Commissioner to issue subpoenas compelling production of books and records); *Hawaii Psychiatric Soc.* v. *Ariyoshi*, 481 F. Supp. 1028 (Haw. 1979) (action to enjoin enforcement of state statute that authorized issuance of administrative inspection warrants to search records of Medicaid providers); *Bilbrey* v. *Brown*, 738 F. 2d 1462 (CA9 1984) (parents sought declaration that school board guidelines authorizing warrantless searches by school principal and teacher were unconstitutional); see also *Mid-Atlantic Accessories Trade Assn.* v. *Maryland*, 500 F. Supp. 834, 848–849 (Md. 1980) (challenging constitutionality of

The Court noted in *Leon* that the "good-faith" exception to the exclusionary rule would not apply "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc.* v. *New York*, 442 U. S. 319 (1979)," or where the warrant was so facially deficient "that the executing officers cannot reasonably presume it to be valid." 468 U. S., at 923. Similar constraints apply to the exception to the exclusionary rule we recognize today. A statute cannot support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws. Nor can a law enforcement officer be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional. Cf. *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). As we emphasized in *Leon*, the standard of reasonableness we adopt is an objective one; the standard does not turn on the subjective good faith of individual officers. See *United States* v. *Leon*, 468 U. S., at 919, n. 20.[12]

---

Maryland Drug Paraphernalia Act as violative of the Fourth Amendment and other constitutional provisions).

The dissent takes issue with the rule announced in this case because it can result in having a defendant, who has successfully challenged the constitutionality of a statute, denied the benefits of suppression of evidence. *Post*, at 368–369. As the dissent itself recognizes, however, this identical concern was present in *Leon*. The dissent offers no reason why this concern should be different when a defendant challenges the constitutionality of a statute rather than of a warrant.

[12] The Illinois Supreme Court did not consider whether an officer's objectively reasonable reliance upon a statute justifies an exception to the exclusionary rule. Instead, as noted above, the court rested its holding on the existence of a "substantive-procedural dichotomy," which it would derive

## III

Applying the principle enunciated in this case, we necessarily conclude that Detective McNally's reliance on the

from this Court's opinion in *Michigan* v. *DeFillippo*, 443 U. S. 31 (1979). See 107 Ill. 2d 107, 118, 481 N. E. 2d 703, 708 (1985). We do not believe the distinction relied upon by the Illinois court is relevant in deciding whether the exclusionary rule should be applied in this case.

This Court in *DeFillippo*, which was decided before *Leon*, drew a distinction between evidence obtained when officers rely upon a statute that defines a substantive crime, and evidence obtained when officers rely upon a statute that authorizes searches without a warrant or probable cause. The Court stated that evidence obtained in searches conducted pursuant to the latter type of statute traditionally had been excluded. 443 U. S., at 39. None of the cases cited in *DeFillippo* in support of the distinction, however, addressed the question whether a good-faith exception to the exclusionary rule should be recognized when an officer's reliance on a statute was objectively reasonable. Rather, those cases simply evaluated the constitutionality of particular statutes, or their application, that authorized searches without a warrant or probable cause. See *Torres* v. *Puerto Rico*, 442 U.S 465 (1979) (statute that allowed police to search luggage of any person arriving at an airport or pier in Puerto Rico, without any requirement of probable cause, violated Fourth Amendment); *Almeida-Sanchez* v. *United States*, 413 U. S. 266 (1973) (search pursuant to statute that allowed United States Border Patrol to conduct warrantless searches within a "reasonable distance" from border, and regulation that defined such distance as 100 air miles, and without any requirement of probable cause violated Fourth Amendment); *Berger* v. *New York*, 388 U. S. 41 (1967) (statute that authorized court-ordered eavesdropping without requirement that information to be seized be particularized violated Fourth Amendment). See also *Sibron* v. *New York*, 392 U. S. 40 (1968) (search pursuant to statute that allowed officers to search an individual upon "reasonable suspicion" that he was engaged in criminal activity was unreasonable because it was conducted without probable cause). See *United States* v. *Leon*, 468 U. S., at 912, n. 8.

For purposes of deciding whether to apply the exclusionary rule, we see no valid reason to distinguish between statutes that define substantive criminal offenses and statutes that authorize warrantless administrative searches. In either situation, application of the exclusionary rule will not deter a violation of the Fourth Amendment by police officers, because the officers are merely carrying out their responsibilities in implementing the statute. Similarly, in either situation, there is no basis for assuming that

Illinois statute was objectively reasonable.[13] On several occasions, this Court has upheld legislative schemes that authorized warrantless administrative searches of heavily regulated industries. See *Donovan* v. *Dewey*, 452 U. S. 594 (1981) (inspections of underground and surface mines pursuant to Federal Mine Safety and Health Act of 1977); *United States* v. *Biswell*, 406 U. S. 311 (1972) (inspections of firearms dealers under Gun Control Act of 1968); *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970) (inspections of liquor dealers under 26 U. S. C. §§ 5146(b) and 7606 (1964 ed.)). It has recognized that an inspection program may be a necessary component of regulation in certain industries, and has acknowledged that unannounced, warrantless inspections may be necessary "if the law is to be properly enforced and inspection made effective." *United States* v. *Biswell*, 406 U. S., at 316; *Donovan* v. *Dewey*, 452 U. S., at 603. Thus, the Court explained in *Donovan* that its prior decisions

> "make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his

---

the exclusionary rule is necessary or effective in deterring a legislature from passing an unconstitutional statute. There is no basis for applying the exclusionary rule to exclude evidence obtained when a law enforcement officer acts in objectively reasonable reliance upon a statute, regardless of whether the statute may be characterized as "substantive" or "procedural."

[13] The question whether the Illinois statute in effect at the time of McNally's search was, in fact, unconstitutional is not before us. We are concerned here solely with whether the detective acted in good-faith reliance upon an apparently valid statute. The constitutionality of a statutory scheme authorizing warrantless searches of automobile junkyards will be considered in No. 86–80, *New York* v. *Burger*, cert. granted, 479 U. S. 812 (1986).

property will be subject to periodic inspections undertaken for specific purposes." *Id.*, at 600.

In *Donovan,* the Court pointed out that a valid inspection scheme must provide, "in terms of the certainty and regularity of its application . . . a constitutionally adequate substitute for a warrant." *Id.*, at 603. In *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307 (1978), to be sure, the Court held that a warrantless administrative search under § 8(a) of the Occupational Safety and Health Act of 1970 was invalid, partly because the "authority to make warrantless searches devolve[d] almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." *Id.*, at 323.[14] In contrast, the Court in *Donovan* concluded that the Federal Mine Safety and Health Act of 1977 imposed a system of inspection that was sufficiently tailored to the problems of unsafe conditions in mines and was sufficiently pervasive that it checked the discretion of Government officers and established "a predictable and guided federal regulatory presence." 452 U. S., at 604.

Under the standards established in these cases, Detective McNally's reliance on the Illinois statute authorizing warrantless inspections of licensees was objectively reasonable. In ruling on the statute's constitutionality, the Illinois Supreme Court recognized that the licensing and inspection scheme furthered a strong public interest, for it helped to "facilitate the discovery and prevention of automobile thefts." 107 Ill. 2d, at 116, 481 N. E. 2d, at 707. The court further concluded that it was "reasonable to assume that warrantless adminis-

---

[14] The Court expressly limited its holding in *Barlow's* to the inspection provisions of the Act. It noted that the "reasonableness of a warrantless search . . . will depend upon the specific enforcement needs and privacy guarantees of each statute," and that some statutes "apply only to a single industry, where regulations might already be so pervasive that a *Colonnade-Biswell* exception to the warrant requirement could apply." 436 U. S., at 321.

trative searches are necessary in order to adequately control the theft of automobiles and automotive parts." *Ibid.* The Court of Appeals for the Seventh Circuit, upholding the amended version of the statute, pointed out that used-car and automotive-parts dealers in Illinois "are put on notice that they are entering a field subject to extensive state regulation." See *Bionic Auto Parts & Sales, Inc.* v. *Fahner*, 721 F. 2d, at 1079. The Illinois statute was thus directed at one specific and heavily regulated industry, the authorized warrantless searches were necessary to the effectiveness of the inspection system, and licensees were put on notice that their businesses would be subject to inspections pursuant to the state administrative scheme.

According to the Illinois Supreme Court, the statute failed to pass constitutional muster solely because the statute "vested State officials with too much discretion to decide who, when, and how long to search." 107 Ill. 2d, at 116, 481 N. E. 2d, at 707. Assuming, as we do for purposes of this case, that the Illinois Supreme Court was correct in its constitutional analysis, this defect in the statute was not sufficiently obvious so as to render a police officer's reliance upon the statute objectively unreasonable. The statute provided that searches could be conducted "at any reasonable time during the night or day," and seemed to limit the scope of the inspections to the records the businesses were required to maintain and to the business premises "for the purposes of determining the accuracy of required records." Ill. Rev. Stat., ch. 95½, ¶ 5–401(e) (1981). While statutory provisions that circumscribe officers' discretion may be important in establishing a statute's constitutionality,[15] the additional restrictions on dis-

---

[15] For example, the amended version of the Illinois statute, upheld by the Court of Appeals for the Seventh Circuit, incorporated the following: (1) the inspections were to be initiated while business was being conducted; (2) each inspection was not to last more than 24 hours; (3) the licensee or his representative was entitled to be present during the inspection; and (4) no more than six inspections of one business location could be conducted

cretion that might have been necessary are not so obvious that an objectively reasonable police officer would have realized the statute was unconstitutional without them.[16] We therefore conclude that Detective McNally relied, in objective good faith, on a statute that appeared legitimately to allow a warrantless administrative search of respondents' business.[17]

---

within any 6-month period except pursuant to a search warrant or in response to public complaints about violations. Ill. Rev. Stat., ch. 95½, ¶ 5–403 (1985).

[16] Indeed, less than a year and a half before the search of respondents' yard, the Supreme Court of Indiana upheld an Indiana statute, authorizing warrantless administrative searches of automobile businesses, that was similar to the Illinois statute and did not include extensive restrictions on police officers' discretion. See *State* v. *Tindell*, 272 Ind. 479, 399 N. E. 2d 746 (1980).

[17] Respondents also argue that Detective McNally acted outside the scope of the statute, and that such action constitutes an alternative ground for suppressing the evidence even if we recognize, as we now do, a good-faith exception when officers reasonably rely on statutes and act within the scope of those statutes. We have observed, see n. 5, *supra*, that the trial court indicated that McNally may have acted outside the scope of his statutory authority. In its brief to the Illinois Supreme Court, the State commented that "[McNally's] search was properly limited to examining the records and inventory of the Action Iron and Metal Company." Brief for Appellant in No. 60629 (Sup. Ct. Ill.), p. 26. The Illinois Supreme Court, however, made no reference to the trial court's discussion regarding the scope of McNally's authority; instead, it affirmed the suppression of the evidence on the ground that a good-faith exception was not applicable in the context of the statute before it.

We anticipate that the Illinois Supreme Court on remand will consider whether the trial court made a definitive ruling regarding the scope of the statute, whether the State preserved its objection to any such ruling, and, if so, whether the trial court properly interpreted the statute. At this juncture, we decline the State's invitation to recognize an exception for an officer who erroneously, but in good faith, believes he is acting within the scope of a statute. Not only would such a ruling be premature, but it does not follow inexorably from today's decision. As our opinion makes clear, the question whether the exclusionary rule is applicable in a particular context depends significantly upon the actors who are making the relevant decision that the rule is designed to influence. The answer to this question might well be different when police officers act outside the scope

Accordingly, the judgment of the Supreme Court of Illinois is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, dissenting.

While I join in JUSTICE O'CONNOR's dissenting opinion, I do not find it necessary to discuss the Court's holdings in *United States* v. *Calandra*, 414 U. S. 338 (1974), *Stone* v. *Powell*, 428 U. S. 465 (1976), and *United States* v. *Janis*, 428 U. S. 433 (1976). See *post*, at 368–369. Accordingly, I do not subscribe to that portion of the opinion.

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

The Court today extends the good-faith exception to the Fourth Amendment exclusionary rule, *United States* v. *Leon*, 468 U. S. 897 (1984), in order to provide a grace period for unconstitutional search and seizure legislation during which the State is permitted to violate constitutional requirements with impunity. *Leon*'s rationale does not support this extension of its rule, and the Court is unable to give any independent reason in defense of this departure from established precedent. Accordingly, I respectfully dissent.

The Court, *ante*, at 348, accurately summarizes *Leon*'s holding:

> "In *Leon*, the Court held that the exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was objectively reasonable, even though the warrant was ultimately found to be defective."

of a statute, albeit in good faith. In that context, the relevant actors are not legislators or magistrates, but police officers who concededly are "engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948).

The Court also accurately summarizes the reasoning supporting this conclusion as based upon three factors: the historic purpose of the exclusionary rule, the absence of evidence suggesting that judicial officers are inclined to ignore Fourth Amendment limitations, and the absence of any basis for believing that the exclusionary rule significantly deters Fourth Amendment violations by judicial officers in the search warrant context. *Ibid.* In my view, application of *Leon*'s stated rationales leads to a contrary result in this case.

I agree that the police officer involved in this case acted in objective good faith in executing the search pursuant to Ill. Rev. Stat., ch. 95½, ¶ 5–401(e) (1981) (repealed 1985). *Ante,* at 360. And, as the Court notes, *ante,* at 357, n. 13, the correctness of the Illinois Supreme Court's finding that this statute violated the Fourth Amendment is not in issue here. Thus, this case turns on the effect to be given to statutory authority for an unreasonable search.

Unlike the Court, I see a powerful historical basis for the exclusion of evidence gathered pursuant to a search authorized by an unconstitutional statute. Statutes authorizing unreasonable searches were the core concern of the Framers of the Fourth Amendment. This Court has repeatedly noted that reaction against the ancient Act of Parliament authorizing indiscriminate general searches by writ of assistance, 7 & 8 Wm. III, c. 22, § 6 (1696), was the moving force behind the Fourth Amendment. *Payton* v. *New York*, 445 U. S. 573, 583–584, and n. 21 (1980); *Stanford* v. *Texas*, 379 U. S. 476, 481–482 (1965); *Boyd* v. *United States*, 116 U. S. 616, 624–630 (1886). James Otis' argument to the royal Superior Court in Boston against such overreaching laws is as powerful today as it was in 1761:

". . . I will to my dying day oppose with all the powers and faculties God has given me, all such instruments of

slavery on the one hand, and villany on the other, as this writ of assistance is. . . .

. . . . .

". . . It is a power, that places the liberty of every man in the hands of every petty officer. . . .

". . . No Acts of Parliament can establish such a writ; though it should be made in the very words of the petition, it would be void. An act against the constitution is void." 2 Works of John Adams 523–525 (C. Adams ed. 1850).

See *Paxton's Case*, Quincy 51 (Mass. 1761). James Otis lost the case he argued; and, even had he won it, no exclusionary rule existed to prevent the admission of evidence gathered pursuant to a writ of assistance in a later trial. But, history's court has vindicated Otis. The principle that no legislative Act can authorize an unreasonable search became embodied in the Fourth Amendment.

Almost 150 years after Otis' argument, this Court determined that evidence gathered in violation of the Fourth Amendment would be excluded in federal court. *Weeks* v. *United States*, 232 U. S. 383 (1914). In *Mapp* v. *Ohio*, 367 U. S. 643 (1961), the rule was further extended to state criminal trials. This exclusionary rule has, of course, been regularly applied to evidence gathered under statutes that authorized unreasonable searches. See, *e. g.*, *Ybarra* v. *Illinois*, 444 U. S. 85 (1979) (statute authorized search and detention of persons found on premises being searched pursuant to warrant); *Torres* v. *Puerto Rico*, 442 U. S. 465 (1979) (statute authorized search of luggage of persons entering Puerto Rico); *Almeida-Sanchez* v. *United States*, 413 U. S. 266 (1973) (statute authorized search of automobiles without probable cause within border areas); *Sibron* v. *New York*, 392 U. S. 40 (1968) (statute authorized frisk absent constitutionally required suspicion that officer was in danger); *Berger* v. *New York*, 388 U. S. 41 (1967) (permissive eavesdrop statute).

Indeed, *Weeks* itself made clear that the exclusionary rule was intended to apply to evidence gathered by officers acting under "legislative . . . sanction." *Weeks* v. *United States, supra*, at 394.

*Leon* on its face did not purport to disturb these rulings. "'Those decisions involved statutes which, by their own terms, authorized searches under circumstances which did not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment.' *Michigan* v. *DeFillippo*, 443 U. S., at 39. The substantive Fourth Amendment principles announced in those cases are fully consistent with our holding here." *United States* v. *Leon*, 468 U. S., at 912, n. 8. In short, both the history of the Fourth Amendment and this Court's later interpretations of it, support application of the exclusionary rule to evidence gathered under the 20th-century equivalent of the Act authorizing the writ of assistance.

This history also supplies the evidence that *Leon* demanded for the proposition that the relevant state actors, here legislators, might pose a threat to the values embodied in the Fourth Amendment. Legislatures have, upon occasion, failed to adhere to the requirements of the Fourth Amendment, as the cited cases illustrate. Indeed, as noted, the history of the Amendment suggests that legislative abuse was precisely the evil the Fourth Amendment was intended to eliminate. In stark contrast, the Framers did not fear that judicial officers, the state actors at issue in *Leon*, posed a serious threat to Fourth Amendment values. James Otis is as clear on this point as he was in denouncing the unconstitutional Act of Parliament:

> "In the first place, may it please your Honors, I will admit that writs of one kind may be legal; that is, special writs, directed to special officers, and to search certain houses, &c. specially set forth in the writ, may be granted by the Court of Exchequer at home, upon oath made before the Lord Treasurer by the person who asks it, that

he suspects such goods to be concealed in those very places he desires to search." 2 Works of John Adams 524 (C. Adams ed. 1850).

The distinction drawn between the legislator and the judicial officer is sound. The judicial role is particularized, fact specific, and nonpolitical. Judicial authorization of a particular search does not threaten the liberty of everyone, but rather authorizes a single search under particular circumstances. The legislative Act, on the other hand, sweeps broadly, authorizing whole classes of searches, without any particularized showing. A judicial officer's unreasonable authorization of a search affects one person at a time; a legislature's unreasonable authorization of searches may affect thousands or millions and will almost always affect more than one. Certainly the latter poses a greater threat to liberty.

Moreover, the *Leon* Court relied explicitly on the tradition of judicial independence in concluding that, until it was presented with evidence to the contrary, there was relatively little cause for concern that judicial officers might take the opportunity presented by the good-faith exception to authorize unconstitutional searches. "Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions." *United States* v. *Leon, supra,* at 917. Unlike police officers, judicial officers are not "engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 14 (1948). The legislature's objective in passing a law authorizing unreasonable searches, however, is explicitly to facilitate law enforcement. Fourth Amendment rights have at times proved unpopular; it is a measure of the Framers' fear that a passing majority might find it expedient to compromise Fourth Amendment values that these values were embodied in the Constitution itself. *Bram* v. *United States,* 168 U. S. 532, 544 (1897). Legislators by virtue of their political role are more often sub-

jected to the political pressures that may threaten Fourth Amendment values than are judicial officers.

Finally, I disagree with the Court that there is "no reason to believe that applying the exclusionary rule" will deter legislation authorizing unconstitutional searches. *Ante*, at 352. "The inevitable result of the Constitution's prohibition against unreasonable searches and seizures and its requirement that no warrant shall issue but upon probable cause is that police officers who obey its strictures will catch fewer criminals." Stewart, 83 Colum. L. Rev. 1365, 1393 (1983). Providing legislatures a grace period during which the police may freely perform unreasonable searches in order to convict those who might have otherwise escaped creates a positive incentive to promulgate unconstitutional laws. Cf. *Weeks* v. *United States*, 232 U. S., at 392–393. While I heartily agree with the Court that legislators ordinarily do take seriously their oaths to uphold the Constitution and that it is proper to presume that legislative Acts are constitutional, *ante*, at 351, it cannot be said that there is no reason to fear that a particular legislature might yield to the temptation offered by the Court's good-faith exception.

Accordingly, I find that none of *Leon*'s stated rationales, see *ante*, at 348, supports the Court's decision in this case. History suggests that the exclusionary rule ought to apply to the unconstitutional legislatively authorized search, and this historical experience provides a basis for concluding that legislatures may threaten Fourth Amendment values. Even conceding that the deterrent value of the exclusionary rule in this context is arguable, I am unwilling to abandon both history and precedent weighing in favor of suppression. And if I were willing, I still could not join the Court's opinion because the rule it adopts is both difficult to administer and anomalous.

The scope of the Court's good-faith exception is unclear. Officers are to be held not "to have acted in good-faith reliance upon a statute if its provisions are such that a rea-

sonable officer should have known that the statute was un-constitutional. Cf. *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)." *Ante*, at 355. I think the Court errs in importing *Harlow*'s "clearly established law" test into this area, because it is not apparent how much constitutional law the reasonable officer is expected to know. In contrast, *Leon* simply instructs courts that police officers may rely upon a facially valid search warrant. Each case is a fact-specific, self-terminating episode. Courts need not inquire into the officer's probable understanding of the state of the law except in the extreme instance of a search warrant upon which no reasonable officer would rely. Under the decision today, however, courts are expected to determine at what point a reasonable officer should be held to know that a statute has, under evolving legal rules, become "clearly" unconstitutional. The process of clearly establishing constitutional rights is a long, tedious, and uncertain one. Indeed, as the Court notes, *ante*, at 357, n. 13, the unconstitutionality of the Illinois statute is not clearly established to this day. The Court has granted certiorari on the question of the constitutionality of a similar statutory scheme in *New York* v. *Burger*, 479 U. S. 482 (1986). Thus, some six years after the events in question in this case, the constitutionality of statutes of this kind remains a fair ground for litigation. Nothing justifies a grace period of such extraordinary length for an unconstitutional legislative act.

The difficulties in determining whether a particular statute violates clearly established rights are substantial. See 5 K. Davis, Administrative Law Treatise § 27:24, p. 130 (2d ed. 1984) ("The most important effect of [*Davis* v. *Scherer*, 468 U. S. 183 (1984)] on future law relates to locating the line between established constitutional rights and clearly established constitutional rights. In assigning itself the task of drawing such a line the Court may be attempting the impossible. Law that can be clearly stated in the abstract usually becomes unclear when applied to variable and imperfectly

understood facts . . ."). The need for a rule so difficult of application outside the civil damages context is, in my view, dubious. The Court has determined that fairness to the defendant, as well as public policy, dictates that individual government officers ought not be subjected to damages suits for arguable constitutional violations. *Harlow* v. *Fitzgerald*, 457 U. S. 800, 807 (1982) (citing *Butz* v. *Economou*, 438 U. S. 478, 506 (1978)). But suppression of illegally obtained evidence does not implicate this concern.

Finally, I find the Court's ruling in this case at right angles, if not directly at odds, with the Court's recent decision in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987). In *Griffith*, the Court held that "basic norms of constitutional adjudication" and fairness to similarly situated defendants, *id.*, at 322, require that we give our decisions retroactive effect to all cases not yet having reached final, and unappealable, judgment. While the extent to which our decisions ought to be applied retroactively has been the subject of much debate among Members of the Court for many years, *id.*, at 320–326, there has never been any doubt that our decisions are applied to the parties in the case before the Court. *Stovall* v. *Denno*, 388 U. S. 293, 301 (1967). The novelty of the approach taken by the Court in this case is illustrated by the fact that under its decision today, no effective remedy is to be provided in the very case in which the statute at issue was held unconstitutional. I recognize that the Court today, as it has done in the past, divorces the suppression remedy from the substantive Fourth Amendment right. See *United States* v. *Leon*, 468 U. S., at 905–908. This Court has held that the exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States* v. *Calandra*, 414 U. S. 338, 348 (1974). Moreover, the exclusionary remedy is not made available in all instances when Fourth Amendment rights are implicated. See, *e. g.*, *Stone*

v. *Powell*, 428 U. S. 465 (1976) (barring habeas corpus review of Fourth Amendment suppression claims); *United States* v. *Janis*, 428 U. S. 433 (1976) (no suppression remedy for state Fourth Amendment violations in civil proceedings by or against the United States). Nevertheless, the failure to apply the exclusionary rule in the very case in which a state statute is held to have violated the Fourth Amendment destroys all incentive on the part of individual criminal defendants to litigate the violation of their Fourth Amendment rights. In my view, whatever "basic norms of constitutional adjudication," *Griffith* v. *Kentucky*, *supra*, at 322, otherwise require, surely they mandate that a party appearing before the Court might conceivably benefit from a judgment in his favor. The Court attempts to carve out a proviso to its good-faith exception for those cases in which "the legislature wholly abandoned its responsibility to enact constitutional laws." *Ante*, at 355. Under what circumstances a legislature can be said to have "wholly abandoned" its obligation to pass constitutional laws is not apparent on the face of the Court's opinion. Whatever the scope of the exception, the inevitable result of the Court's decision to deny the realistic possibility of an effective remedy to a party challenging statutes not yet declared unconstitutional is that a chill will fall upon enforcement and development of Fourth Amendment principles governing legislatively authorized searches.

For all these reasons, I respectfully dissent.