**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 15-4276**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

and

STATE OF WEST VIRGINIA,

Intervenor – Appellee,

v.

GARY DALE SPURLOCK,

Defendant – Appellant.

───────────

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Thomas E. Johnston, District Judge. (2:14-cr-00094-1)

───────────

Argued: January 28, 2016          Decided: March 22, 2016

───────────

Before SHEDD and FLOYD, Circuit Judges, and Loretta C. BIGGS, United States District Judge for the Middle District of North Carolina, sitting by designation.

───────────

Affirmed by unpublished per curiam opinion.

───────────

**ARGUED:** James McCall Cagle, Charleston, West Virginia, for Appellant. Jennifer Rada Herrald, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. Jonathan Zak Ritchie, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL,

Charleston, West Virginia, for Intervenor-Appellee. **ON BRIEF:** R. Booth Goodwin II, United States Attorney, Carol Casto, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee United States of America. Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL, Charleston, West Virginia, for Intervenor-Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Gary Dale Spurlock appeals the denial of his motion to suppress firearms seized during a search of his home, arguing that the district court erred in concluding that the search was valid under the third-party consent doctrine. Because the firearms are admissible under the good-faith exception, we affirm.

## I.

On December 5, 2013, Spurlock's live-in girlfriend ("J.W.") filed a domestic violence complaint against him in Boone County, West Virginia. J.W. alleged that Spurlock was "threating to kill me, my daughter and son-in-law," and "trying to hold me captive in the bathroom." (J.A. 43). J.W. also indicated that Spurlock owned guns and used them to threaten her. J.W. requested an emergency protective order (EPO), and she checked the following box on the form:

> I give my consent for any law-enforcement officer to enter my separate residence or household that Respondent and I shared at the time the acts of domestic violence occurred for the purpose of enforcing a Protective Order.

(J.A. 44).

A magistrate judge issued an EPO later that day. As relevant here, the EPO provides that:

> According to W. Va. Codes § 48-27-403 and § 48-27-502(b), the Respondent shall not possess any firearms (even those for which the Respondent has a license to

3

possess) or ammunition while this Protective Order is in effect, and you are hereby informed of this prohibition.

(J.A. 51). Elsewhere, the EPO warns that "it may be a VIOLATION of State and Federal Law to possess any firearm or ammunition while this Order is in effect, even those for which Respondent has a license." (J.A. 49). The magistrate also checked the following pre-printed provision:

> Pursuant to the Rules of Practice and Procedure for Domestic Violence Civil Proceedings, Rule 10b and to enforce the provisions of W. Va. Code Chapter 48, Article 27 regarding firearms; it is hereby ORDERED to protect the physical safety of the Petitioner and other protected individuals herein that:
>
> **Respondent shall surrender any and all firearms and ammunition possessed or owned by the Respondent to the law enforcement officer serving this Order.**

(J.A. 52) (emphasis added).

Consistent with J.W.'s complaint, the magistrate also checked and initialed a box stating: "Petitioner gives consent for any law enforcement officer to enter his or her separate residence or the household jointly owned by the parties and awarded herein to Petitioner with or without a warrant to enforce the Emergency Protective Order as provided by W. Va. Code § 48-27-601." (J.A. 52). Finally, the EPO awarded J.W. "temporary possession of the residence or household jointly resided in by the parties at the time the abuse occurred" and stated that Spurlock should vacate the premises once the EPO was filed. (J.A. 52).

4

Despite the issuance of the EPO on December 5, no action occurred for several days. In fact, on December 9, J.W. returned to the Boone County Sheriff's Office and spoke with Corporal Michael Foster to ask about the delay. During this period, Spurlock remained in the home with several of J.W.'s relatives, although J.W. herself had vacated the residence.

Spurlock was finally served with the EPO on December 10 when he voluntarily reported to the Sheriff's Office.[1] Corporal Foster served Spurlock with the EPO, explaining that it was a civil order, not criminal, and that Spurlock was not being arrested. Foster then asked Spurlock if he had any firearms. Spurlock responded affirmatively, and Foster told Spurlock that the EPO required him to surrender those weapons. Spurlock was cooperative and agreed that Foster and another officer could follow Spurlock to his house. Once at the house, Spurlock took the officers to a walk-in closet in the master bedroom and opened a combination safe that contained most of his firearms. Spurlock testified at the suppression hearing that J.W. "had the combination to my safe," that "[h]er jewelry" was in the safe, and that she "had full access, the same as I did." (J.A. 109). After Spurlock opened the safe, the officers asked him to move back into the bedroom while they secured the guns. Among the

---

[1] Spurlock's attorney informed him about the EPO.

guns Foster retrieved was a sawed-off shotgun. Foster told Spurlock that the barrel looked short and the gun might be illegal. Spurlock responded "[m]aybe most of the guns I have are illegal." (J.A. 82). Spurlock was not arrested at that time, and the officers left peacefully after recovering 22 guns.

That night, Foster checked the guns on a national database and found that several had been stolen. In addition, one of the guns had an obliterated serial number. Based on these findings, Foster obtained a search warrant for Spurlock's house. During the subsequent search of the house, officers recovered several additional guns. Foster also obtained a warrant for Spurlock's arrest. Based on the foregoing, Spurlock was charged in a two-count indictment relating to the sawed-off shotgun and the gun with the obliterated serial number with: (1) possession of a illegal sawed-off shotgun, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; and (2) possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B).

Spurlock moved to suppress the two guns, arguing that the search and seizure violated his constitutional rights, primarily his Fourth Amendment right against unreasonable seizures. Spurlock also apparently challenged the constitutionality of the West Virginia domestic violence protection statutes to the extent those statutes authorized the seizure of firearms as part

6

of an EPO. The district court held an evidentiary hearing at which Foster and Spurlock testified. The court also requested that the State of West Virginia intervene to defend the constitutionality of its domestic violence protection statutes.[2]

Ultimately, the district court denied the motion to suppress. United States v. Spurlock, 2014 WL 7013801 (S.D. W.Va. Dec. 12, 2014). The court concluded that J.W. gave written consent to enter the premises to carry out the EPO and that this consent extended to the temporary seizure of the guns. The court also concluded that J.W. had the right to consent to the search of the safe given Spurlock's testimony that she had equal access to it. The court further found that the consent "imposed no limits on the items or areas subject to the consent search, and it extended implicitly to the areas of the house which the officers would reasonably believe it necessary to enter to enforce the terms of the EPO." Spurlock, 2014 WL 7013801, at *5. Given this broad consent, the court stated that "it was objectively reasonable for the officers to believe they had J.W.'s consent to enter the bedroom closet to enforce the order's requirement that Defendant surrender any and all firearms." Id. The court also noted that, under Georgia v.

---

[2] West Virginia intervened below and on appeal to defend the statutes.

Randolph, 547 U.S. 103, 120 (2006), a defendant who is physically present may revoke third-party consent to search, but that Spurlock did not exercise that right.

Following the denial of his suppression motion, Spurlock entered a conditional plea to Count 2 (obliterated serial number), and the court sentenced him to three years of probation. Spurlock timely appealed.

## II.

On appeal, Spurlock renews his contention that the firearms should have been suppressed.[3] We review the district court's factual findings on a suppression motion for clear error and its legal conclusions de novo. United States v. Stover, 808 F.3d 991, 994 (4th Cir. 2015). "When, as here, a motion to suppress has been denied, we view the evidence presented in the light

---

[3] Spurlock also argues—as he did below—that the seizure violated his Fifth Amendment right against self-incrimination. In addressing this claim, the district court concluded that the seized firearms were not testimonial because they are "mere physical evidence that neither explicitly nor implicitly reveal any contents of Defendant's mind." Spurlock, 2014 WL 7013801, at *8. We have reviewed this claim and find it to be without merit. See United States v. Duncan, 331 Fed. App'x. 270, 272 (4th Cir. 2009) (finding similar surrender of firearms was not "compelled" under Fifth Amendment because defendant "never claimed the Fifth Amendment privilege in response to the domestic violence protective order directing him to turn over a firearm to state officials, and no evidence suggests the Government sought to induce forfeiture of the privilege by threatening sanctions through service of the protective order").

most favorable to the government." United States v. Watson, 703 F.3d 684, 689 (4th Cir. 2013).

In relevant part, the Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. In order "to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect," Arizona v. Evans, 514 U.S. 1, 10 (1995), the Court created the exclusionary rule. However, "exclusion of evidence has 'always been our last resort, not our first impulse,'" United States v. Stephens, 764 F.3d 327, 335 (4th Cir. 2014) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)), because it creates "substantial social costs," United States v. Leon, 468 U.S. 897, 907 (1984). Recently, the Court has made clear that the exclusionary rule's "sole purpose" "is to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 131 S.Ct. 2419, 2426 (2011). Given this purpose, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009).

Thus, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their

conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." Davis, 131 S.Ct. at 2427-28 (internal citations and quotation marks omitted). Our analysis of this good-faith exception is "objective," and "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." Herring, 555 U.S. at 145 (internal quotation marks omitted). Importantly, "[o]ur precedent makes it clear that application of the good-faith inquiry is not limited to the specific circumstances addressed by the Supreme Court." Stephens, 764 F.3d at 336. We are permitted to advance directly to the question of good faith without first determining if the underlying search or seizure was illegal. United States v. Legg, 18 F.3d 240, 243 (4th Cir. 1994)

Here, even assuming the seizure of the two guns was illegal, their exclusion serves no deterrent effect because a reasonably well-trained officer would not have known of the seizure's illegality. The EPO was a valid court order issued by a neutral magistrate upon a showing that J.W. had "proven" domestic abuse by clear and convincing evidence. (J.A. 51). The EPO further provided that Spurlock "shall surrender any and all firearms and ammunition possessed or owned . . . to the law

10

enforcement officer serving" the EPO in order to "enforce the provisions of W. Va. Code Chapter 48, Article 27." (J.A. 52). Foster was following the dictates of this valid court order when he asked Spurlock if the latter had firearms at his house. See Leon, 468 U.S. at 925-26 (good-faith exception applies when police reasonably rely on a warrant later held invalid); Herring, 555 U.S. at 146-48 (good-faith exception applies where police reasonably rely on information in a database maintained by police employees). In particular, like a search warrant, the EPO "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer." Leon, 468 U.S. at 913-14 (internal quotation marks omitted).[4]

To the extent Spurlock's challenge hinges on the constitutionality of West Virginia's domestic violence protection statutes, it still fails because "[u]nless a statute is clearly unconstitutional, an officer cannot be expected to

---

[4] Leon recognized that "[d]eference to the magistrate" "is not boundless" and, accordingly, recognized three limitations on the use of the good-faith exception in this context. Leon, 468 U.S. at 914. Thus, the exception does not apply if the search warrant affidavit is supported by reckless falsity, if the magistrate serves as a rubber stamp for the police, and if the warrant was supported by a bare bones affidavit. Id. at 914-15. Assuming similar restrictions would apply to the EPO, we find that Spurlock has failed to show their applicability in his case.

question the judgment of the legislature that passed the law." Illinois v. Krull, 480 U.S. 340, 349-50 (1987). Here, given the Supreme Court's recent (and consistent) admonitions that "[f]irearms and domestic strife are a potentially deadly combination nationwide," United States v. Hayes, 555 U.S. 415, 427 (2009) there is nothing plainly unconstitutional about a statute authorizing the temporary seizure of firearms upon the issuance of an EPO. See also United States v. Mahin, 668 F.3d 119, 124 (4th Cir. 2012) ("It is well-established that firearms and domestic strife are a potentially deadly combination nationwide") (internal quotation marks omitted). In fact, multiple states have prohibitions similar to West Virginia's, yet our research reveals no court has ever ruled such statutes unconstitutional.

The Davis Court remarked that "in 27 years of practice under Leon's good-faith exception, we have never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." Davis, 131 S.Ct. at 2429 (internal quotation marks omitted). Here, Foster had a valid court order requiring Spurlock to turn over any firearms in his possession and seized the weapons after Spurlock assented to the order. Foster's nonculpable conduct does not warrant suppression of the firearms.

III.

For the foregoing reasons, we affirm the district court's denial of Spurlock's motion to suppress.

AFFIRMED