**UNITED STATES of America,**

**v.**

**Kevin Lamar WILSON, and Lawrence Brown, Defendants.**

**Criminal No. 02–13J.**

United States District Court,
W.D. Pennsylvania.

Aug. 15, 2002.

---

Arthur T. McQuillan, Gleason, DiFrancesco, Shahade, Barbin, McQuillan & Markovitz, Johnstown, PA, for Kevin Lamar Wilson.

Michael A. Filia, Johnstown, PA, for Lawrence Brown.

John J. Valkovci, Jr., United States Attorney's Office, Johnstown, PA, for the United States of America.

## MEMORANDUM and ORDER

D. BROOKS SMITH, Chief Judge.

### I. Introduction

On November 2, 2001 at approximately 1:00 a.m., Police Officer Scott Haymaker spotted defendants Kevin Lamar Wilson and Lawrence Brown while the pair were walking on Franklin Street in Johnstown. He stopped them, and subsequently seized crack cocaine from both men. A three count indictment was returned by a grand jury in April 2002, charging the defendants with violations of the Controlled Substances Act. The defendants moved to suppress the crack cocaine, dkt. nos. 28, 33, challenging the constitutionality of a curfew ordinance that was cited by the government as the basis for initially stopping the defendants and arguing that the investigating officer lacked a reasonable suspicion to justify the stop. In addition, the defendants asserted that subsequent pat down and strip searches violated the constitution.

An evidentiary hearing was conducted on July 23, 2002. The following constitute my findings of fact and conclusions of law. Because I have concluded that the initial stop was not supported by a reasonable suspicion of criminal activity, I will grant the motions to suppress.

### II. Facts

Officer Scott Haymaker of the Johnstown, Pennsylvania Police Department worked the night shift from November 1, 2001 at 11:00 p.m. until November 2, 2001 at 7:00 a.m. At five minutes before 1:00 a.m., Haymaker brought his marked police cruiser to a stop on South Street at its intersection with Franklin Street. Dkt. no. 40, at 14–15 (hereinafter cited as "Tr."). He observed two young black males, who were walking along the 800 block of Franklin Street, approach the intersection. Tr. at 16. The young men crossed the intersection, walking directly in front of Haymaker's police cruiser, and continued walking. Tr. at 16–17. Haymaker followed the men, turning right onto Franklin Street, so he could get another look at them as they approached the Jolly Fiddler, a bar in the 700 block of Franklin Street that was "notorious" for drug transactions. Tr. 20, 49. According to Haymaker, the men were "just walking," tr. at 17, and they did not accelerate their pace or act suspiciously in any manner after walking in front of police cruiser. Tr. at 40. Haymaker circled the block after his second look and "decided [he] was going to stop them and find out what they were doing." Tr. at 20. He pulled his cruiser to the curb so that it was in front of the two men and advised the department's dispatcher of his position on Franklin Street. Tr. at 23.

After stopping his cruiser, Haymaker exited the vehicle and walked towards its trunk and the two men. By this time, the pair were on the sidewalk near the rear of Haymaker's cruiser. Haymaker remarked that he had never seen them before and asked where they were from. Tr. at 106. After informing Haymaker that they were from Philadelphia, Haymaker asked if they were "slinging dope." *Id.* The men denied that they "slinging dope," and when Haymaker inquired further, the men reiterated that they were from Philadelphia and that they were staying with someone named "Craig." Although neither man knew Craig's surname, they knew he lived at 614 Franklin Street. Because of the address, Haymaker believed the "Craig" being referred to was Craig King, an individual whom Haymaker knew had been involved in drug trafficking and weapons violations. Tr. 26. Eventually, in response to additional questioning, the younger-looking of

the two men, defendant Lawrence Brown, identified himself and indicated that he was seventeen years old. The older man, defendant Kevin Lamar Wilson, stated that he was Lamar Wilson and that he was twenty-one years old. Neither man produced identification. Tr. 21–22.

By this time, Sergeant Andrew Frear, the shift supervisor for the Johnstown Police Department, arrived on the scene, parking his police vehicle immediately behind Haymaker's cruiser. Upon exiting his vehicle, Frear asked "what he [ (Haymaker) ] had going on." Tr. at 75. Haymaker advised Frear that Brown was only seventeen years old and that Wilson was twenty-one years old. *Id.* In response to Frear's inquiry about his age, Brown again stated that he was seventeen. *Id.* Frear informed Brown that he was in violation of the curfew ordinance and handcuffed Brown's hands behind his back. Tr. at 76.

The curfew ordinance Frear cited was an ordinance of the City of Johnstown. It prohibits "minors under eighteen years of age" from loitering "in and upon public streets ... or other public grounds" between the hours of 10:00 p.m. and 5:00 a.m. of the following day. Court Exh.1.

Incident to Brown's arrest for the curfew violation, Frear conducted a search of Brown's person. Tr. at 76–77. He recovered a Motorola Micro Talk Cobra radio, a kind of walkie-talkie, and a fairly large lump of cash which was folded in half and at least two inches thick. Tr. at 77. Frear asked Brown about the money and Brown advised that he had sold shoes at Sears. Tr. at 44, 80. After this exchange, Frear put Brown inside Haymaker's police cruiser. Tr. at 48.

After Frear arrived on the scene, Haymaker focused his attention on Wilson, who was near the rear wheel on the passenger side of Haymaker's police cruiser. Further conversation with Wilson, who was cooperative and did not make any furtive movements, tr. 57–58, revealed that both men had arrived from Philadelphia that morning by train. Tr. 25. Hearing the exchange between Frear and Brown, Haymaker momentarily directed his attention to Frear and observed a "wad" of money and the radio. Tr. at 28–29. Haymaker then simultaneously advised Wilson that he was going to pat him down for weapons and initiated the pat-down search. The search recovered only another Motorola Micro Talk Cobra radio. Tr. at 29.

Because Haymaker knew that these radios were often used by drug dealers to communicate with one another, Haymaker requested that the dispatcher run the name of Lamar Wilson and his date of birth to check for warrants for his arrest.[1] While he waited, Haymaker continued his conversation with Wilson, during which Wilson said that he used the radio to "talk back and forth" with Brown. Tr. at 31. Wilson also repeated that he was stay-

1. During his direct examination, Haymaker's testimony was equivocal with respect to whether the pat down or the request for the warrant check occurred first. He "believe[d]" he had called Wilson's name and date of birth into the dispatcher before conducting the pat down. Tr. at 27–28. On cross examination, he affirmed that he conducted the pat down prior to contacting the dispatcher. Tr. at 56. On re-direct, Haymaker testified that he requested the warrant check before conducting the pat down search of Wilson. Tr. at 68. Defense counsel, dur-

ing re-cross, impeached Haymaker's testimony that he called for a warrant check first by referring Haymaker to his police report. The excerpt read from the police report indicated that the pat down, which recovered the second Micro Talk radio, occurred first. Tr. at 69. At that point, Haymaker conceded that the pat down preceded the request for a warrant check. Tr. at 70. Consistent with the factual summary above, I find Haymaker conducted the pat-down before requesting a check for outstanding warrants.

with Craig and that Craig's girlfriend was Tessa. Tr. at 26. This additional information further buttressed Haymaker's belief that the "Craig" at issue was indeed Craig King, who had been charged in the past with both drug and weapon violations. *Id.*

The police dispatcher then inquired whether Frear had his cell phone or the site was "secure." Tr. at 31–32. This inquiry, according to the officers, was a signal that "something was going on" with respect to the search for warrants and that information could not be transmitted over the radio unless the scene was secure. In response to this inquiry, Haymaker directed Wilson to put his hands on the trunk of the police cruiser and Frear returned to his vehicle, where he immediately contacted the dispatcher. The dispatcher advised that there was a "hit" for a "Kevin Lamar Wilson," with the same date of birth, for an assault. Tr. at 84.

In response to Frear's request for information on the individual's physical characteristics, the dispatcher indicated that Wilson had a scar on his cheek. *Id.* Frear confirmed that Wilson had a scar on his cheek. Although Wilson had originally indicated that his name was only "Lamar Wilson" and the dispatcher had information on a Kevin Lamar Wilson, tr. at 84, Frear called out the name "Kevin" from his vehicle and Wilson turned his head in Frear's direction. Tr. at 86. Because Haymaker and Frear believed the outstanding warrant for Kevin Lamar Wilson applied to the Lamar Wilson in their pres-ence, Haymaker placed him in handcuffs and advised that he was to be transported back to the police department so his identity could be verified. Tr. at 87.

Haymaker transported both men to the police department's headquarters in the Public Safety Building. On the way, Haymaker pointed out Craig King's house and asked if that was where both men were staying. They acknowledged that it was. Tr. at 34. At the Public Safety Building, Frear and Haymaker escorted the two men to the processing area. Wilson was seated beside the "ten printer" machine so his fingerprints could be obtained to verify his identity. Tr. at 35. A criminal records check on Brown revealed that, despite the absence of a criminal history, he had three dates of birth. Two of the birth dates indicated Brown was nineteen, the third was consistent with the age of seventeen. Tr. 35–36, 88. Subsequently, it was learned that Brown was actually nineteen. Tr. at 48.

According to Frear, he decided that Brown should be strip searched [2] and he and Haymaker escorted Brown to cell # 1. Tied to the zipper of Brown's pants was a plastic baggie containing 35 rocks of crack cocaine. Tr. at 38. Wilson was strip searched next. Haymaker found Wilson's identification in his shoe under the insole. Tr. at 64. Crack was also discovered on Wilson's person.[3]

A grand jury subsequently returned a three count indictment on April 16, 2002,

**2.** Haymaker testified that both men were alarmed when they were advised that the officers intended to strip search them. According to Haymaker, they were "extremely nervous," tr. at 36, their eyes got "real big" and they were sitting in their chairs "shaking." Tr. at 37. My immediate impression was that this testimony was exaggerated. That impression was consistent with the look of disbelief I observed on the faces of the defendants as Haymaker concluded this aspect of his testimony.

**3.** Wilson's motion to suppress sought to exclude crack cocaine which was discovered in his undershorts during the strip search. Haymaker's testimony, however, referenced only the discovery of Wilson's identification in his shoe and never explained where crack was discovered on Wilson's person, or even that it was discovered at all.

charging violations of the Controlled Substances Act. Dkt. no. 1. Defendants moved to suppress the crack cocaine which was seized during their respective strip searches. They argued that the curfew ordinance was unconstitutional and that it served as a pretext for the stop.[4] The information possessed by Haymaker prior to the stop, according to defendants, was insufficient to establish a reasonable suspicion of criminal activity. In addition, defendants contend that the pat down and strip searches were also unconstitutional.

### III. Reasonable Suspicion for the Initial Stop

■ "[A]n officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This "requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123, 120 S.Ct. 673 (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). In other words, an officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." 528 U.S. at 123–24, 120 S.Ct. 673 (quoting *Terry*, 392 U.S. at 22–23, 88 S.Ct. 1868) (internal quotation marks omitted). In determining whether an officer had a reasonable suspicion, a district court must consider the totality of the circumstances

existing before the stop. *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002); *Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir.2002).

The constitutionality of Haymaker's initial stop along Franklin Street turns entirely on whether the stop was to investigate a possible curfew violation or whether it was instead a drug investigatory stop. This difference is material because Haymaker would have had a sufficient articulable suspicion that the defendants were violating Johnstown's curfew ordinance, but he lacked the requisite suspicion that they were engaged in narcotics trafficking.

On the one hand, Haymaker testified during the suppression hearing that Brown "looked very, very young" and was "definitely below the age of 18." Tr. at 17. With respect to Wilson, Haymaker acknowledged that he too looked young, but it was "close ... he could have went either way." Tr. at 19. After personally observing the defendants during the suppression hearing, I have no reason to disbelieve Haymaker's assessment regarding their youthfulness. If he had stopped the defendants in order to determine whether they were violating Johnstown's curfew ordinance, the defendants' youthful appearances would support an articulable suspicion of a curfew violation, thereby justifying Haymaker's stop.

On the other hand, if Haymaker's initial stop was to conduct a more generalized drug investigation, nothing in the record

**4.** I need not address the constitutionality of the curfew ordinance inasmuch as I have concluded that the initial stop was not supported by a reasonable suspicion of criminal activity. In any event, it appears that *Michigan v. DeFillippo*, 443 U.S. 31, 37, 40, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), would most likely obviate the need to consider the constitutionality of the ordinance inasmuch as

the defendants have not been charged with violating that ordinance. *See also Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). Of course, the constitutionality of the curfew ordinance could properly be raised if the defendants had been charged with violating that ordinance. *See City of Chicago v. Morales*, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

substantiates an articulable suspicion that the defendants were engaged in a drug offense. *Wardlow* is instructive. There, the police officers were in a four car caravan of marked patrol cars in a heavy narcotics trafficking area when they observed the defendant look in their direction and flee. They pursued the defendant, stopped him, conducted a protective pat down search for weapons and discovered a firearm in a bag. The defendant sought to exclude the firearm, arguing that the officers did not have a reasonable suspicion. The *Wardlow* majority recognized that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable particularized suspicion that the person is committing a crime." 528 U.S. at 124, 120 S.Ct. 673. It explained, however, that the defendant's presence in the high crime area *plus* his unprovoked flight were sufficient to justify the officers' suspicion that Wardlow was involved in criminal activity. According to the Court, Wardlow's flight was the "consummate act of evasion," which was "certainly suggestive" of wrongdoing. 528 U.S. at 123–124, 120 S.Ct. 673.

Like *Wardlow*, the defendants in this case were in a heavy narcotics trafficking area. The presence of the defendants in a high crime area, however, is the only similarity between *Wardlow* and this case. Instead of fleeing from the officer, Brown and Wilson continued to walk down the street at that late hour. Neither man quickened his pace nor ran from the area. Indeed, Haymaker admitted during his testimony that after the defendants crossed the street in front of his cruiser they did not in any way act suspiciously, and nothing else caught his attention. This limited information would be insufficient to create a reasonable suspicion that criminal activity is afoot. *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673; *see also Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam) (investiga-

tory stop at airport was not supported by reasonable suspicion because the only information known before stopping the defendant was that he had a shoulder bag and was occasionally looking back at another man with an identical bag).

As the Supreme Court observed in *Florida v. J.L.*, 529 U.S. at 271, 120 S.Ct. 1375, the "reasonableness of official suspicion must be measured by what the officers knew before they conducted their [stop]." Here, the only information known before the stop was that these two young African–American men were walking down the street in a high drug trafficking area late at night. Prior to the stop, Haymaker knew none of the following: who these men were; where they were from; when they had arrived in Johnstown; who they were staying with; that their host had previously been charged with drug and weapon violations; how much money Brown possessed; that each man possessed a Cobra Micro Talk radio; and that neither man would produce any identification. All Haymaker knew when he stopped the defendants was that they were present late at night in a high crime area. Thus, he had no facts to which he could apply his experience in drug interdiction and draw a specific reasonable inference of ongoing drug activity. *See Terry*, 392 U.S. at 27, 88 S.Ct. 1868 (observing that reasonable suspicion determination requires that due weight be accorded inferences drawn from the facts and officer's experience). Without such a reasonable articulable suspicion, a drug investigatory stop in this case would violate the Fourth Amendment.

The crucial issue, then, is which kind of stop Haymaker conducted; was he inquiring about a suspected curfew violation, or was he conducting a generalized drug investigation? It is to that question I now turn.

## IV. The Initial Stop Was for a Drug Investigation, Not a Curfew Investigation

Based on the evidence adduced at the suppression hearing, I find as a matter of fact that Haymaker's initial stop was a generalized drug investigatory stop, not an inquiry into a possible curfew violation. "Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985); *see also United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995) ("In evaluating the constitutionality of a police traffic stop, most courts agree that an objective analysis of the facts and circumstances surrounding the stop is appropriate."). It is for the District Court to weigh the evidence presented at the suppression hearing and make the appropriate objective assessment based on all the facts and circumstances. *See, e.g., United States v. Hawkins*, 811 F.2d 210, 213 n. 3 & 4 (3d Cir.1987) (noting the District Court's assessment of the evidence and its conclusions about the purpose of the traffic stop). An objective assessment of the facts in this case leads inexorably to the conclusion that the initial stop was not a limited investigation of a possible curfew violation.

Had Haymaker wanted to investigate a curfew violation, he could have stopped Brown and Wilson as soon as they passed in front of his police cruiser. Instead, Haymaker drove past them, observed that they were approaching the Jolly Fiddler—an establishment known for drug trafficking—and decided that he was "going to stop them and find out what they were doing." Tr. 20. Haymaker's own testimony thus indicates that the scope of his initial investigatory stop was far broader than a simple inquiry into a suspected curfew violation.

In addition, the testimony at the suppression hearing convinces me that the initial exchange between Haymaker and the defendants did not concern either the curfew or their ages. Instead, Haymaker focused upon Brown and Wilson's reasons for being in that high drug trafficking area late at night, and he accused them of "slinging dope." Tr. at 106. While I recognize that Haymaker testified that he immediately advised the defendants about the curfew and asked their ages, his testimony was equivocal about what he said initially. *See* tr. at 21 (asked their age); at 22 (told them about the ordinance before asking their age).

More importantly, Haymaker's version of what transpired is undermined in several respects. First, as I pointed out above, there are other portions of Haymaker's testimony, relating to the timing of Wilson's pat down and the demeanor of the defendants upon learning that they were to be strip searched, which were not credible. *See supra*, Part II, n. 1, 2. Second, there is the fact that, had Haymaker initially referenced the curfew and asked about their ages, Brown would almost certainly not have lied about being 17 when he is in fact 19. If Haymaker had indicated that he stopped Brown and Wilson to investigate their possible curfew violation, Brown would have had no reason to lie in a manner that would most likely mean he was violating the curfew. In addition, Haymaker's own testimony demonstrated that he was unclear about the terms of the curfew ordinance.[5] Thus, I simply do not

---

5. *See* tr. at 20 (stating he "believe[d]" curfew was from 9:00 p.m. to 5:00 a.m.); tr. at 42 (acknowledging he was "not sure" about the specific terms of the ordinance); tr. at 54–55 (indicating that there was some confusion within the department about the actual start time of the curfew which had been "scratched out").

credit Haymaker's account of his initial statements, and I credit instead Wilson's contrary statement that Haymaker stopped them and accused the defendants of "slinging dope."

My finding that this stop was not a curfew investigation is further buttressed by the fact that Wilson was not released or advised that he was free to go once Haymaker learned he was twenty one years of age. Nor was there any attempt at that point to contact the dispatcher to determine if there was information available to verify his age and identity. Instead, despite the fact that Brown had been handcuffed and was ready for transport, Haymaker continued to question Wilson, proceeding to conduct a pat down search for weapons when there was no basis to hold him any longer. Indeed, it is only after Haymaker found the second radio during the pat down that he requested a warrant check to determine if there was some basis for detaining Wilson. Tr. at 56, 69–70.

As I explained above, *supra* Part III, Haymaker lacked a reasonable articulable suspicion that would have permitted a drug investigatory stop under *Terry*. Because Haymaker's initial stop of Brown and Wilson was indeed a drug investigatory stop, that stop violated the Fourth Amendment.

 In reaching this conclusion, I do not hold that Haymaker's initial stop was an unlawful pretext stop predicated on a suspected curfew violation. Of course, it is now well-settled that a law enforcement officer's motive in carrying out a *Terry* stop is irrelevant to the constitutional evaluation of that stop. *See Whren v. United States*, 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Rather, I conclude that an objective assessment of Haymaker's actions shows them to be inconsistent with a limited curfew investigatory stop, whether pretextual or otherwise. Hay-

maker's motives in stopping Brown and Wilson are irrelevant to my conclusion, because my objective assessment of Haymaker's actions reveals the nature of the stop he in fact conducted.

The United States takes the position that Haymaker did not use the curfew ordinance as a pretext for any other investigation. *See* dkt. no. 34, at 16 n. 4. Accordingly, the United States argues that Haymaker made the initial stop based on his supposedly reasonable suspicion that Brown and Wilson were violating the Johnstown curfew. Had Haymaker initially conducted an investigation of the possible curfew violation, this suspicion would have justified the stop, as I explained *supra* Part III. But Haymaker's initial investigation was in fact a more generalized investigation into possible drug trafficking. No *post hoc* rationalization based on the curfew violation can rescue the initial stop from its lack of a reasonable articulable suspicion as its basis. *See Hawkins*, 811 F.2d at 213 ("the legality of a stop must be judged by the objective facts known by the seizing officers *rather than by the justifications articulated by them*" (emphasis added)).

In a way, this case is almost the converse of *Macon*. In *Macon*, a plainclothes officer purchased two obscene magazines from a store using a marked $50 bill. He and his fellow officers then re-entered the store, placed the clerk who sold the magazine under arrest, and took the $50 bill that had been used to make the purchase without returning the change received at the time of the purchase. *See Macon*, 472 U.S. at 465, 105 S.Ct. 2778. The defendant argued that, despite the fact that the magazines were obtained by a purchase, the "bona fide nature of the purchase evaporated when the officers later seized the marked $50 bill and failed to return the change." *Id.* at 470, 105 S.Ct. 2778.

The Supreme Court disagreed: "Objectively viewed, the transaction was a sale in the ordinary course of business. The sale is not retrospectively transformed into a warrantless seizure by virtue of the officer's subjective intent to retrieve the purchase money to use as evidence." *Id.* at 471, 105 S.Ct. 2778. In the instant case, the initial stop was itself unconstitutional because Haymaker lacked a reasonable articulable suspicion to conduct a drug investigatory stop. It cannot be "retrospectively transformed" by his subsequent intention to arrest Brown on the curfew violation.

The Third Circuit has suggested in *dicta* that it would find a Fourth Amendment violation in circumstances roughly analogous to these. In *Rogers v. Powell*, 120 F.3d 446 (3d Cir.1997), Pennsylvania State Police troopers arrested Rogers based upon a nonexistent Lycoming County arrest warrant. Although the troopers believed there to be a Lycoming warrant for Rogers' arrest, they did not fully ascertain whether the Lycoming warrant existed, and in fact, it did not. At the same time, there were two Clinton County summary warrants for Rogers' arrest, but the troopers did not want to arrest Rogers on those warrants because that would require an immediate appearance—in the middle of the night—before the District Justice. *See id.* at 449–52. The Third Circuit subsequently concluded that Rogers' arrest was unlawful because the arresting officers had no facts to support an independent determination of probable cause to make the arrest. *See id.* at 453. In reaching this conclusion, the Third Circuit rejected the suggestion that, because the troopers could have arrested Rogers on the outstanding Clinton County warrants, they possessed the requisite probable cause. *See id.* at n. 5. Although the court expressly did not reach the issue, it noted that "we would be troubled by an argument suggesting that a legitimate basis for an arrest identified only after the arrest would provide sufficient grounds therefor." *Id.* This case presents an analog to the argument that the Third Circuit found troubling in *Rogers*. Here, Haymaker made an initial stop of Brown and Wilson based on his unreasonable suspicion that they were "slinging dope." It is true that he could have made a more limited initial stop based upon the possible curfew violation, but that is not in fact what he did. The *post hoc* curfew rationale for Haymaker's stop cannot retroactively justify the initial stop when all the facts indicate that the purpose of his initial investigatory stop was to detect and thwart any drug activity in a high crime area.

█ The Supreme Court has recognized that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Whren*, 517 U.S. at 814, 116 S.Ct. 1769. The *Whren* Court addressed pretextual searches and seizures and refused to allow an unreasonable subjective intent to prevent a reasonable objective search. The same Fourth Amendment concern, however, must refuse to allow a reasonable subjective intent to permit an unreasonable objective search. Even accepting the United States' position that Haymaker's subjective intent was to conduct a curfew stop, an objective assessment of his actions shows that the scope of his investigation was beyond the Johnstown curfew ordinance and was in fact a generalized drug investigation. In these circumstances, the fact that the more limited investigatory stop would have been justified cannot authorize a more extensive investigation without a reasonable articulable suspicion. Haymaker lacked a reasonable articulable suspicion to stop Brown and Wilson to investigate possible drug trafficking; his stop was therefore unconstitutional.

**478**

Because all of the evidence seized in this case was "come at by the exploitation of" the unconstitutional investigatory stop, it must be excluded. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The defendants' motions to suppress will therefore be granted.[6]

Accordingly, this *15th* day of August 2002, it is hereby

ORDERED AND DIRECTED that the defendants' motions to suppress, dkt. nos. 28, 33, are GRANTED.

---

6. In light of this disposition, I need not address the constitutionality of the pat down and strip searches which occurred.