NOT DESIGNATED FOR PUBLICATION

No. 121,904

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

ROBERT D. HOMOLKA,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; ROBERT A. MARTINEZ, judge. Opinion filed July 10, 2020. Affirmed.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Jay Norton*, of Norton Hare, LLC, of Overland Park, for appellee.

Before LEBEN, P.J., SCHROEDER, J., and LAHEY, S.J.

PER CURIAM: Robert D. Homolka submitted to a warrantless blood draw after Kansas Highway Patrol troopers arrested him for driving under the influence of alcohol. The district court granted Homolka's motion to suppress the results of the blood draw, and the State appeals. Finding no error by the district court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On January 19, 2018, Kansas Highway Patrol troopers received information from dispatch related to a hit-and-run by a possible drunk driver. The tag information for the involved vehicle was registered to Homolka. Homolka's address was in Lake of the Forest, a gated community near Bonner Springs. Two troopers drove to the address and discovered Homolka lying next to the vehicle in his driveway. Homolka had a minor laceration on his forehead and scraped knees when the troopers found him.

The interactions between one trooper and Homolka were captured on the trooper's body camera, and a 45-minute video was submitted to the district court for review. One trooper also testified about those events. When the trooper arrived at Homolka's residence, he inspected Homolka's car for damage and saw it had damage consistent with the hit-and-run accident and a flat tire. He first asked Homolka how he got the injuries, and Homolka replied he was not sure. The trooper also asked Homolka where he had driven from. Homolka responded he came home from a bar, but the trooper was not able to understand the name of the bar. After being asked how much he had to drink, Homolka responded he had three beers. Homolka was unable to stand up without assistance, so the troopers decided that standard field sobriety testing would not have been safe and made the determination to get medical attention for Homolka. The trooper testified he placed Homolka in the front seat of his patrol car but did not handcuff him, then drove him to the front gate of the neighborhood where the EMS ambulance was located.

Medical personnel performed a general assessment of Homolka. The paramedic testified Homolka had an odor of consumed alcohol but also described Homolka as awake, able to make conversation, exhibiting no slurred speech, and having no life-threatening injuries or bleeding that needed correcting. When asked how he got injured, Homolka told the paramedic he had slipped on the top step of his residence. The trooper

testified the only question he asked Homolka while at the ambulance was which car he drove home from the bar. Homolka responded by saying his white Buick.

When the medical personnel completed their duties, the trooper asked Homolka if he would submit to a blood draw, and Homolka agreed. The trooper handed Homolka the "OAG Substitute for DC-70 (Rev. 02/26/2016)" (DC-70) form that provided the implied consent notices. The implied consent notices in this version of the DC-70 did not contain the provision that advised it was a crime to refuse to submit to testing, nor did it contain the provision that advised it was not a constitutional right to refuse to submit to testing. The form stated that "Kansas law (K.S.A. 8-1001) requires you" to submit to the testing, and that is what the trooper told Homolka, in addition to the other advisements. After reading the form to Homolka, the trooper again asked if Homolka would submit to a blood draw. Homolka agreed, and the paramedic drew his blood. After the blood sample was drawn, the troopers took Homolka back to his house, then left. From the trooper's perspective, Homolka was never under arrest that evening.

Homolka was charged with driving under the influence of alcohol. Homolka filed a motion to suppress the results of the blood draw, arguing lack of consent under the Fourth Amendment to the United States Constitution. Following the hearing, the district court took the matter under advisement and, thereafter, granted the suppression motion.

In its ruling, the district court noted multiple discrepancies between the trooper's testimony and the video recording of the encounter. For example, the trooper testified he never asked Homolka if he wanted emergency medical help. In fact, the district court noted the first thing the trooper asked Homolka was if he needed any EMS assistance. Homolka clearly said no, to which the trooper said, "Well, then you're going to take a stroll with us." The trooper did not check the damage on Homolka's vehicle at the beginning of the encounter as he described in his testimony. The trooper testified Homolka was not placed under arrest, was not in custody, was not handcuffed, and was

placed in the front passenger seat of the trooper's patrol car when he was transported to the ambulance. The district court determined from the video Homolka was physically taken into custody, handcuffed, and placed into the back seat of the trooper's car when he was taken from his house to EMS personnel. The district court found no evidence on the video that Homolka told the trooper he had just left a bar. The district court found the audio in the video indicated the troopers were strategizing on how to get Homolka to consent to a blood draw. The troopers did not ask Homolka about the hit-and-run accident until approximately 20 minutes after the tape started. The video showed Homolka's vehicle was not inspected until after the blood draw and Homolka was taken home even though the trooper said he inspected the car when he first arrived at Homolka's residence. In its ruling, the district judge twice commented that he believed the trooper was being evasive in his testimony.

The district court ruled the State failed to meet its burden to prove Homolka unequivocally, specifically, freely, and intelligently consented to the blood test. It found Homolka "merely submitted to lawful authority" in agreeing to take the test. Because the trooper told Homolka that Kansas law "required" him to submit to testing, the consent was coerced. The State thereafter filed a motion to reconsider, arguing the good-faith exception should apply. The motion was denied, and the State timely filed this interlocutory appeal.

I.    DID THE DISTRICT COURT ERR IN GRANTING THE MOTION TO SUPPRESS?

"Faced with a motion to suppress evidence, the State bears the burden of proving the search and seizure were lawful." *State v. Hubbard*, 309 Kan. 22, 31, 430 P.3d 956 (2018); see K.S.A. 22-3216(2). When reviewing a motion to suppress evidence, the appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence but reviews the ultimate legal conclusions using a de novo standard. In reviewing the factual findings, the appellate court does not

4

reweigh the evidence or assess the credibility of witnesses. *State v. Brown*, 306 Kan. 1145, 1151, 401 P.3d 611 (2017).

The Fourth Amendment prohibits unreasonable searches and seizures by the government, and "Section 15 of the Kansas Constitution Bill of Rights offers at least the same protections." *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016). The trooper did not obtain a search warrant prior to the paramedic drawing Homolka's blood. Both the United States Supreme Court and our Supreme Court have made clear that the taking of a blood sample is a search subject to the warrant requirement. See *Birchfield v. North Dakota*, 579 U.S. ___, ___, 136 S. Ct. 2160, 2173, 195 L. Ed. 2d 560 (2016); *State v. Ryce*, 303 Kan. 899, 910, 368 P.3d 342 (2016) (*Ryce I*), aff'd on reh'g 306 Kan. 682, 396 P.3d 711 (2017) (*Ryce II*). "[W]arrantless searches are per se unreasonable unless they fall within an exception to the warrant requirement." *Hubbard*, 309 Kan. at 33. An individual's consent to search is one of the established exceptions to the warrant requirement. *Ryce I*, 303 Kan. at 914.

The State argues Homolka consented to the blood draw. To establish valid consent, the State must prove "(1) clear and positive testimony that consent was unequivocal, specific, and freely given, and (2) the absence of duress or coercion, express or implied." *Cleverly*, 305 Kan. at 613. The existence of consent to a search "is a question of fact to be determined from the totality of all the circumstances." *Ryce I*, 303 Kan. at 932. "The standard for measuring the scope of a [person]'s consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [person]?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991). Mere acquiescence to a claim of lawful authority is inadequate to show voluntary consent. *State v. Jones*, 279 Kan. 71, 78, 106 P.3d 1 (2005). "'Voluntariness [of an individual's consent is] an issue of fact which is reviewed on appeal for substantial competent evidence.'" *State v. James*, 301 Kan. 898, 909, 349 P.3d 457 (2015).

Here, the trooper read Homolka the implied consent provisions in the revised DC-70 before Homolka submitted to a blood test. The first implied consent notice provision mirrors K.S.A. 2017 Supp. 8-1001(k)(1): "Kansas law *requires* the person to submit to and complete one or more tests of breath, blood or urine to determine if the person is under the influence of alcohol or drugs, or both." (Emphasis added.) But Kansas law only authorizes an officer to *request* a person take the test: "A law enforcement officer shall request a person to submit to a test . . . ." K.S.A. 2017 Supp. 8-1001(b).

The district court concluded the State did not prove Homolka's consent was voluntary. In so finding, the district court relied on how *State v. Edgar*, 296 Kan. 513, 294 P.3d 251 (2013), and *City of Lenexa v. Gross*, No. 96,367, 2007 WL 2043580 (Kan. App. 2007) (unpublished opinion), differentiated between the words "required" and "requested." In *Gross*, 2007 WL 2043580, at *4, a panel of our court held that telling a driver she was "'required by law'" to take a preliminary breath test, despite the fact refusal was an option, was coercive. In *Edgar*, again involving a PBT, the officer incorrectly told Edgar he had no right to refuse a PBT. Our Supreme Court found the misstatement of the law "transformed the [request for a PBT] into an involuntary search" because the driver would understand he had no choice. 296 Kan. at 530.

Here, Homolka argued, and the district court agreed, the language of the implied consent advisory in K.S.A. 2017 Supp. 8-1001 informing a driver that he or she is required to submit to a blood test was coercive based on *Edgar* and *Gross*. "Required," in the opinion of the district court, did not represent choice, while "requested" did. Thus, the language of the DC-70 was coercive because Homolka consented after being told he was required to consent to the test.

The State argues the full context of the DC-70 makes it clear that Homolka had a choice because paragraph 3 of the implied consent advisory informed him of the consequences of refusing to submit to any test "requested" by the officer. It contends

6

"[t]he one instance of the word 'require' in the DC-70 does not invalidate the overall message." The State also argues that "Homolka's driving privileges, like those of every other Kansan, were contingent on his compliance with K.S.A. 8-1001. In order to keep his license, he was *required* to submit to a blood sample." The State's argument may be correct insofar as to the application of K.S.A. 8-1001 to administrative proceedings involving Homolka's driving privileges. But we are not concerned here with whether Homolka is entitled to maintain his driving privileges. Similarly, the issue here is not whether telling a driver he or she is required to submit to testing invalidates the entire implied consent advisory scheme or undercuts the constitutionality of K.S.A. 8-1001. Substantial compliance with K.S.A. 8-1001 is not a substitute for consent under the Fourth Amendment. We are concerned here with Homolka's Fourth Amendment rights in a criminal proceeding and whether he validly waived the warrant requirement by consenting to the blood test. The question before us is whether, under all the circumstances, including the language used in the DC-70, the district court had substantial competent evidence supporting its conclusion that a reasonable person would feel coerced into submitting to testing.

None of the cases cited by the State specifically address the issue here—the coercive effect of an officer obtaining consent by first telling the defendant that Kansas law requires he or she submit to testing. No Kansas law requires a DUI suspect to submit to a blood draw. To the contrary, a defendant has a constitutional right not to submit to testing without a warrant commanding it, and the right to refuse a test is a "fundamental Fourth Amendment right." *Ryce I*, 303 Kan. at 951. Our Supreme Court recognized the implied consent advisory misstated the law by stating Kansas law requires a person submit to testing. "Significantly, while the statutory implied consent advisory informs the driver he or she is required to take a blood alcohol content test or face consequences, K.S.A. 2016 Supp. 8-1001(k), an officer can only 'request' that a driver submit to a test, K.S.A. 2016 Supp. 8-1001(b), (c)." *Ryce II*, 306 Kan. at 695.

7

In *Ryce II*, our Supreme Court reiterated that consent is not voluntary if it was obtained "'by means of an inaccurate, and therefore coercive, advisement.'" 306 Kan. at 687. Because K.S.A. 2017 Supp. 8-1001 does not require a person to submit to a test, the trooper misstated the law when he told Homolka that Homolka was required to submit to a blood test. Under the totality of circumstances, the district court did not err by considering the coercive effect of telling Homolka he was "required" to submit to testing.

We note Homolka also contends paragraph 8 of the notice given by the trooper is also coercive because it provides: "Refusal to submit to testing may be used against you at any trial on a charge arising out of the operation or attempted operation of a vehicle while under the influence of alcohol or drugs, or both." The district court did not address this point in its ruling. Homolka contends his refusal to submit to the test was an assertion of his "'fundamental liberty interest in avoiding an unreasonable search.'" See *Ryce I*, 303 Kan. at 963. He further contends substantive due process under the Fourth and Fourteenth Amendments to the United States Constitution prohibits the government from introducing evidence of or commenting on a defendant's invocation of his constitutional right to refuse a warrantless search. The State does not directly address this argument except by contending the DC-70 used in this case correctly advised Homolka of all potential *civil* penalties for refusal. The State's argument is unpersuasive because nothing in the advisory limits its application to civil or administrative proceedings. We find the threat that a defendant's exercise of a fundamental constitutional right will be used against him or her in a criminal trial, while perhaps not dispositive, is a factor to be considered, under the totality of the circumstances, when determining if consent was freely given or coerced.

The district court found the trooper to be evasive and inaccurate during his testimony about his encounter with Homolka. The trooper denied he had handcuffed Homolka when he took him into custody and denied placing him thereafter in the back seat of the patrol car when transporting him away from his house. The trooper testified he

did not consider Homolka to have ever been placed in custody or under arrest. But the district court found Homolka was ordered to go with law enforcement, physically escorted to the trooper's car, and handcuffed—"Defendant is told what to do and where to go do it." The first question the trooper asked Homolka was, "'Do you need EMS help?'" The district court found Homolka clearly said, "no." In response, the trooper said, "'Well, then you're going to take a stroll with us.'" Homolka was handcuffed and taken away for medical treatment. By his actions, the trooper was dismissive of Homolka's answer and took him for medical attention even though Homolka said he did not want it. The trooper's unwillingness to take no for an answer is supportive of the district court's determination that Homolka was just submitting to lawful authority rather than freely consenting to the blood test.

Under the totality of the circumstances, the evidence shows the trooper provided Homolka with an inaccurate and, therefore, coercive advisement, and the trooper's testimony lacked credibility in the view of the district court. We agree the State failed to meet its burden to show consent under Fourth Amendment standards. Had the trooper begun his effort to obtain consent for the search of a home or car with an oral and written statement that said, "Kansas law requires that you submit to the search," we would unquestionably view that as unduly coercive. We see no significant difference for purposes of Fourth Amendment analysis between that example and the present facts. Here, a typical reasonable person would have understood that he or she was required to submit to testing. We find substantial competent evidence supports the ruling by the district court.

II.    DID THE DISTRICT COURT ERR IN FINDING THE GOOD-FAITH EXCEPTION TO THE EXCLUSIONARY RULE DID NOT APPLY?

The trooper's collection of Homolka's blood sample without a warrant and without consent violated the Fourth Amendment and § 15 of the Kansas Constitution Bill of

Rights. Generally, when law enforcement officers obtain evidence in violation of a person's Fourth Amendment rights, the evidence will not be admitted at trial in order to deter law enforcement officers from violating a defendant's constitutional rights. *State v. Pettay*, 299 Kan. 763, 771-72, 326 P.3d 1039 (2014). This exclusionary rule is a judicially created remedy that safeguards our citizens' constitutional rights by preventing the use of evidence obtained through illegal searches or seizures. See *Illinois v. Krull*, 480 U.S. 340, 347, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987); *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010).

"But the exclusionary rule is not absolute." *Pettay*, 299 Kan. at 769. The good-faith exception, beginning with *United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed. 2d 677, *reh. denied* 468 U.S. 1250 (1984), has developed over time to permit the admission of illegally seized evidence when an officer has acted in good-faith reliance upon a warrant or statute. See, e.g., *Krull*, 480 U.S. at 349-350. "The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. *Herring*, 555 U.S. at 143." *Davis v. United States*, 564 U.S. 229, 238, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). The *Davis* Court noted the exclusionary rule had never been applied "to suppress evidence obtained as a result of nonculpable, innocent police conduct." 564 U.S. at 240. The exclusionary rule is a deterrent measure and its application is therefore "'restricted to those situations in which its remedial purpose is effectively advanced.'" *Daniel*, 291 Kan. at 496. When no remedial purpose is served by excluding evidence, the good-faith exception will permit the admission of illegally seized evidence. See *Krull*, 480 U.S. at 347; *Daniel*, 291 Kan. at 496.

Whether the good-faith exception applies in a particular case is reviewed under a bifurcated standard of review. The factual underpinnings for the district court's ruling must be supported by substantial competent evidence, "while the ultimate legal conclusion to be drawn from those facts will be examined de novo." *State v. Zwickl*, 306

Kan. 286, Syl. ¶ 4, 393 P.3d 621 (2017). "'In determining whether to apply the exclusionary rule, a court should examine whether such application will advance the deterrent objective of the rule.'" *State v. Oram*, 46 Kan. App. 2d 899, 909, 266 P.3d 1227 (2011).

The State contends that even if the trooper illegally obtained the blood draw, the good-faith exception should apply because the trooper was required by K.S.A. 2017 Supp. 8-1001 to read the DC-70 to Homolka. The district court found the good-faith exception did not apply because no objective officer would have reasonably relied on the statute: "Law enforcement had every reason to know that the advisory was incorrect and coercive" based on the Kansas Supreme Court decision in *Ryce II* in June 2017. We agree with the district court that the good-faith exception does not apply but for a different reason. See *State v. Wycoff*, 303 Kan. 885, 886, 367 P.3d 1258 (2016).

Although we have not addressed it because it is not raised as an issue on appeal, we note the district court found the trooper violated Homolka's rights under the Fifth Amendment to the United States Constitution during the same encounter and suppressed all statements made by Homolka. The trooper's actions thus violated both Homolka's Fourth and Fifth Amendment rights.

Additionally, and significantly, the district court was justifiably concerned with the accuracy of the trooper's testimony, finding it evasive. But for the district court's review of the 45 minutes of video, crucial facts relevant to the violation of Homolka's constitutional rights would have gone undetected. The accuracy of the trooper's testimony is extraordinarily important in safeguarding the integrity of individual constitutional rights and the fair and just functioning of the judicial system. Here, the district court determined the trooper's testimony was inaccurate and evasive, and its finding is supported by substantial competent evidence. In sum, there is culpable conduct here that justifies excluding the illegally obtained evidence. The trooper violated Homolka's Fourth

11

and Fifth Amendment rights, and we find his evasive and inaccurate testimony bearing on those constitutional rights is not innocent, non-culpable conduct. We have no trouble determining the purpose of the exclusionary rule—to deter wrongful future conduct—is served here by not applying the good-faith exception. Under the facts, the district court did not err in finding the good-faith exception did not apply.

Affirmed.