In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00098-CR**
_____

**KEVIN DUGAR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from County Court at Law No. 3**
**Jefferson County, Texas**
**Trial Cause No. 318255**

_____

**OPINION**

Kevin Dugar appeals from his conviction for driving while intoxicated (DWI), a Class A misdemeanor.[1] Dugar raises two issues for our review. First, Dugar argues the police officer who stopped his SUV lacked reasonable suspicion to conduct the stop. Second, Dugar contends the trial court abused its discretion by admitting the

---

[1]Tex. Penal Code Ann. § 49.04(d).

1

test results the State obtained from Dugar after seizing his blood. For the reasons explained below, we conclude Dugar's arguments seeking to overturn the final judgment lack merit, so we will affirm.

Background

One morning around 1:40 a.m., Officer Christopher Pratt, a police officer employed by the Beaumont Police Department, saw an SUV traveling south on Martin Luther King Parkway (MLK). Officer Pratt was behind the SUV. From there, he noticed the SUV being driven in a manner that allowed it to drift partially into other marked southbound lanes on MLK. From footage taken from Officer Pratt's dashcam video, the SUV is seen drifting across the lane it was in when it is first seen visible in the video. Officer Pratt, who testified in the trial, explained that no other southbound traffic was on MLK near the SUV when he saw it straddling more than one lane on MLK.

Shortly after Officer Pratt noticed the SUV's driver had drifted from the lane it was traveling in, he used his emergency lights to stop the SUV.[2] Dugar was driving the SUV and was the only person inside. At trial, Officer Pratt acknowledged that

_____

[2]*See* Tex. Transp. Code Ann. § 545.060(a) (providing that an operator on a roadway divided into two or more clearly marked lanes for traffic "shall drive as nearly as practical entirely within a single lane" and may not move from that lane unless the movement can be made safely).

2

when he spotted the SUV, no other vehicles were around it on MLK. The officer also agreed that, given the lack of traffic that night, the fact Dugar's SUV drifted across his lane did not pose a danger to anyone traveling on MLK.

After stopping Dugar, Officer Pratt noticed Dugar smelled of alcohol, had glassy eyes, slurred his speech, and had trouble following the officer's directions. Officer Pratt gave Dugar a horizontal gaze nystagmus test, a test he failed. According to Officer Pratt, Dugar then refused to perform the rest of the standard field sobriety test, a test police officers use to identify whether a driver is impaired. Based on what the officer observed before stopping Dugar and the information gathered in the stop, Officer Pratt arrested Dugar because he suspected Dugar of driving while impaired.

At trial, Dugar moved to suppress the evidence police obtained based on the stop, arguing that Officer Pratt lacked reasonable suspicion to stop Dugar without proof to show the movement of Dugar's SUV between lanes endangered anyone on the road. The trial court denied Dugar's motion. Later, the State developed testimony showing that after Officer Pratt arrested Dugar, he obtained a warrant authorizing him to seize a specimen of Dugar's blood. The State had the blood tested in the Jefferson County Crime Lab. At trial, the testimony about the tests shows Dugar's

blood had an alcohol concentration level of 0.15 or more based on testing done at the Jefferson County Crime Lab.[3]

At the end of the trial, the jury found Dugar guilty of DWI. Dugar appealed and raises two issues in his brief. First, he argues Officer Pratt's testimony fails to show that Dugar violated the statute that requires a vehicle being driven on a roadway with clearly marked lanes to maintain a single lane since Officer Pratt acknowledged the movement of the SUV did not endanger anyone else on the road. Second, Dugar argues the State failed to meet its burden to prove that an unbroken chain of custody tied the blood specimens he gave the nurse to the specimen that was later tested at the Jefferson County Crime Lab.

Standard of Review

We review rulings on motions to suppress using a bifurcated standard of review.[4] In Dugar's case, the parties never asked the trial court to provide them with explicit oral or written findings to support the trial court's ruling denying Dugar's motion. In a hearing on a motion to suppress, "the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony."[5] If the trial court did not make any explicit findings of fact in making its ruling, the

---

[3]*See State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).
[4]*Lerma v. State*, 543 S.W.3d 184, 189-90 (Tex. Crim. App. 2018).
[5]*Id*. at 190.

reviewing court "infers the necessary factual findings that support the trial court's ruling if the record evidence (viewed in the light most favorable to the ruling) supports these implied fact findings."[6] For that reason, we afford almost total deference to the ruling the trial court made on the motion when the trial court's ruling hinged on its findings of the historical facts, particularly when they turn on the trial court's decisions about matters concerning credibility and demeanor.[7] We apply this highly deferential standard "regardless of whether the trial court has granted or denied a motion to suppress[.]" By using this standard, we give the trial court's ruling the strongest legitimate view of the evidence, and in the absence of explicit findings, we review the record to determine if the evidence supports the trial court's ruling denying the motion.[8]

According to Dugar, Officer Pratt violated his Fourth Amendment rights by stopping him based on the circumstances described in the record of the stop.[9] The Fourth Amendment to the United States Constitution protects individuals from an unreasonable search or seizure.[10] Under the Fourth Amendment, an arrest is a

---

[6]*Garcia-Cantu*, 253 S.W.3d at 241.
[7]*Id.*
[8]*Id.*
[9]*See* U.S. CONST. amend. IV.
[10]*Id.; see Lerma*, 543 S.W.3d at 190.

5

"quintessential seizure" of the person.[11] Thus, traffic stops based on an officer's suspicion that the driver violated a traffic law "is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."[12]

Should police obtain evidence based on the violation of a suspect's Fourth Amendment rights, the federal exclusionary rule usually prevents a state from using the evidence in a criminal proceeding against the party whose rights were violated.[13] The exclusionary rule prevents the State from using evidence that police obtained directly or indirectly from an illegal seizure, evidence courts often refer to when issuing an opinion discussing the exclusionary rule as the "fruit of the poisonous tree."[14] There are, however, several exceptions to the exclusionary rule, and the exception at issue in Dugar's case involves whether evidence the police obtained from Dugar based on the stop resulted from an objectively reasonable mistake about what the maintain-a-single-lane statute means.[15]

---

[11]*California v. Hodari D.*, 499 U.S. 621, 624 (1991) (cleaned up).
[12]*Heien v. N. Carolina*, 574 U.S. 54, 60 (2014).
[13]*Illinois v. Krull*, 480 U.S. 340, 347 (1987).
[14]*See Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963); *Smith v. State*, 542 S.W.2d 420, 422 (Tex. Crim. App. 1976).
[15]*Heien*, 574 U.S. at 60.

The ruling denying Dugar's motion implies the trial court found Dugar's motion lacked merit. While the trial court did not identify any specific reason for its ruling, we must nonetheless "sustain [the ruling] if [we] conclude[] that the decision is correct on any applicable theory of law."[16] "We review *de novo* whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion of criminal activity."[17]

Analysis

*The Initial Stop*

In Dugar's first issue, he argues Officer Pratt lacked reasonable suspicion to stop his SUV based on his alleged failure to maintain his vehicle within a single lane. According to Dugar, the maintain-a-single-lane statute is not violated unless the driver is shown to both cross a clearly marked lane and to make the movement when the movement is unsafe.[18]

In the trial, Officer Pratt testified that when he saw Dugar's SUV, it did not pose a danger to any other vehicle "during this particular time[.]"[19] The trial court

---

[16]*Arguellez v. State*, 409 S.W.3d 657, 662-63 (Tex. Crim. App. 2013).

[17]*Crain v. State*, 315 S.W.3d 43, 48-49 (Tex. 2010).

[18]Tex. Transp. Code Ann. § 545.060(a).

[19]Dugar did not file a pretrial motion questioning the validity of the stop. Instead, he raised his complaint for the first time at trial when Officer Pratt began describing the circumstances leading to the stop.

denied Dugar's motion based solely on Officer Pratt's description of the circumstances that led to the stop. At trial, the State never established that Officer Pratt had a warrant for Pratt's arrest that authorized the stop. Even so, a police officer may stop a vehicle if its driver violated a traffic law while in the officer's presence without obtaining a warrant if the reasonable suspicion standard is satisfied.[20]

"Reasonable suspicion exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity."[21] This test "is an objective one that focuses solely on whether an objective basis exists for the detention and disregards the officer's subjective intent."[22] A court determines whether reasonable suspicion exists based on "the totality of the circumstances" leading to the stop.[23] "This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists."[24]

Since Dugar was stopped without a warrant, the State bore the burden to establish that what Officer Pratt saw would lead a reasonable police officer to believe

---

[20]*Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015).
[21]*Id.* (cleaned up).
[22]*State v. Kerwick*, 393 S.W.3d 270, 274 (Tex. Crim. App. 2013).
[23]*Id.*
[24] *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

a driver violated the maintain-a-single-lane traffic law based on the movement of the SUV Officer Pratt described in the trial.[25] In its brief, the State raises three arguments to support its claim that a police officer would have a reasonable suspicion to believe the maintain-a-single-lane statute had been violated in the officer's presence. First, the State argues the maintain-a-single-lane statute is violated by movement across lanes "regardless of whether [the movement] was unsafe."[26] To support that argument, the State suggests this Court should follow the reasoning in a plurality opinion by the Texas Court of Criminal Appeals in *Leming v. State*, a case in which that Court determined section 545.060, when properly interpreted "makes it an actionable offense to either fail to maintain a single lane or to change lanes when conditions are not safe to do so."[27] Second, the State argues the movement of Dugar's SUV created a danger to others had anyone tried to pass Dugar when he moved from his clearly marked lane. Third, the State suggests "[t]he objective danger of straddling lanes poses not only the danger of hitting a vehicle in the other lane, but also poses the danger of hitting following vehicles that will be uncertain

---

[25]*See id.*

[26]Tex. Transp. Code Ann. § 545.060(a).

[27]*Leming v. State*, 493 S.W.3d 552, 559-60 (Tex. Crim. App. 2016) (plurality opinion) ("Thus, it is an offense to change marked lanes when it is unsafe to do so; but it is also an independent offense to fail to remain entirely within a marked lane of traffic so long as it remains practical to do so, regardless of whether the deviation from the marked lane is, under the particular circumstances, unsafe.").

which lane the swerving vehicle intends to occupy and thus will be unable to safely pass."

To resolve Dugar's appeal, we need not choose between the competing interpretations of the maintain-a-single-lane statute on which the parties rely in their respective briefs. Instead, we must decide whether an objective police officer could have formed a reasonable suspicion that Dugar violated the maintain-a-single-lane statute in Officer Pratt's presence based on his description explaining why he stopped Dugar based on the movement of the SUV the officer described he saw before conducting the stop.

That the interpretation of section 545.060 is not yet settled is apparent from examining the intermediate courts of appeals cases discussing *Leming*. Simply stated, the intermediate courts are now split about what proof is required to establish a driver violated the maintain-a-single-lane statute, section 545.060.[28] Before the

---

[28]The following seven cases, decided after *Leming,* illustrate the fact that most appellate courts have followed the plurality view of the maintain-a-single-lane statute articulated by the plurality of justices in *Leming*: *Reyes v. State*, 603 S.W.3d 543, 549 (Tex. App.—El Paso 2020, no pet. h.); *State v. Meras*, No. 10-18-00345-CR, 2020 WL 103805, at *2 (Tex. App.—Waco Jan. 8, 2020, pet. filed) (not designated for publication); *State v. Virginia South*, No. 12-17-00176-CR, 2018 WL 636085, at *4 (Tex. App.—Tyler Jan. 31, 2018, pet. ref'd) (not designated for publication); *Shrout v. State*, No. 02-16-00443-CR, 2017 WL 2871686, at *3 (Tex. App.—Fort Worth July 6, 2017, no pet.) (not designated for publication); *Tex. Dep't of Pub. Safety v. Ardoin*, 515 S.W.3d 910, 915 (Tex. App.—Eastland 2017, no pet.);

Court of Criminal Appeals decided *Leming*, the Beaumont Court of Appeals had stated that the statute requires the State to prove the driver crossed a marked lane and to prove the movement "was unsafe or dangerous[,]" holding that, without such evidence, "an actual traffic violation did not occur."[29] While this Court, since deciding *Ehrhart*, has cited *Leming* in several unpublished opinions, none of this Court's post-*Leming* jurisprudence addresses whether we agree or disagree with the plurality view adopted by a plurality of justices on the Court of Criminal Appeals in *Leming*.[30] In a single unpublished opinion decided after *Leming*, however, we did

*Flores v. State*, No. 10-16-00128-CR, 2017 WL 952178, at *3 (Tex. App.—Waco Mar. 8, 2017, no pet.) (not designated for publication); *Wilde v. State*, No. 07-15-00432-CR, 2016 WL 3180290, at 3 (Tex. App.—Amarillo June 3, 2016, no pet.) (not designated for publication). Two of our sister courts, the Corpus Christi Court and the Fourteenth Court of Appeals, have refused to adopt the plurality view espoused in *Leming*: *State v. Hardin*, No. 13-18-00244-CR, 2019 WL 3484428, at *3 (Tex. App.—Corpus Christi Aug. 1, 2019, pet. granted) *and State v. Bernard*, 503 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2016), *judgment vacated on other grounds*, 512 S.W.3d 351 (Tex. Crim. App. 2017).

[29]*Ehrhart v. State*, 9 S.W.3d 929, 930 (Tex. App.—Beaumont 2000, no pet.).

[30]*See* Tex. Transp. Code Ann. § 545.060(a); Tex. R. App. P. 47.7 (providing that unpublished opinions have "no precedential value"); *Williams v. State*, No. 09-19-00299-CR, 2021 WL 1010956, at *5 (Tex. App.—Beaumont Mar. 17, 2021, no. pet.) (not designated for publication); *State v. Adrian*, No. 09-20-00041-CR, 2021 WL 358395, at *4 (Tex. App.—Beaumont Feb. 3, 2021, no pet.) (not designated for publication); *Collier v. State*, 2020 WL 2046152, at *3 (Tex. App.—Beaumont Apr. 29, 2020, no pet.) (not designated for publication); *Hatton v. State*, 2019 WL 453188, at *3 (Tex. App.—Beaumont Feb. 6, 2019, pet. ref'd); *Jeffries v. State*, No. 09-17-00262-CR, 2019 WL 362016, at *3 (Tex. App.—Beaumont Jan. 30, 2019, no pet.) (not designated for publication).

state (without citing *Leming*) that proving a violation of section 545.060 requires the State to prove the driver failed to stay within a single lane *and* moved between lanes under circumstances that made the movement unsafe.[31] Thus, whether the view this Court adopted in 2000 about the meaning of the maintain-a-single-lane statute was a matter subject to reasonable disagreement as of April 16, 2016, the date that a plurality of justices in *Leming* explained that a driver could violate the statute simply by failing to maintain a single lane when it was practical for the driver to do so.[32]

Given that reasonable differences of opinion exist about how the maintain-a-single-lane statute applies under circumstances like those involved in Officer Pratt's stopping Dugar, we conclude a reasonably objective police officer could have interpreted section 545.060 just like Officer Pratt did when he decided to stop Dugar's SUV. Consequently, because the Fourth Amendment tolerates *reasonable* mistakes—whether the mistake is one of law or of fact—we cannot say the trial court erred by denying Dugar's motion to suppress on a record that shows that if the officer was mistaken, the mistake is one that was objectively reasonable.[33] Accordingly, Dugar's first issue is overruled.

---

[31]*Allen v. State*, No. 09-13-00476-CR, 2015 WL 6521690, at *4 (Tex. App.—Beaumont Oct. 28, 2015, no pet.) (mem. op., not designated for publication).

[32]*Leming*, 493 S.W.3d at 559-60

[33]*Heien*, 574 U.S. at 60.

*Seizing Blood Specimens for Testing*

In issue two, Dugar argues the State failed to establish that the nurse drew his blood in a proper and reasonable manner and failed to establish a regular chain of custody existed between the specimens Dugar gave to the nurse and the specimens that were later tested at the Jefferson County Crime Lab. At trial, the State established that Officer Pratt obtained a warrant to seize specimens of Dugar's blood before the nurse drew the specimens. The search-warrant affidavit, which Officer Pratt signed, states Dugar told the officer he had been drinking, the officer noticed Dugar was slurring his speech, Dugar smelled of alcohol, and he had glassy eyes.

In his appeal, Dugar argues there are three reasons the trial court abused its discretion by admitting evidence related to the tests performed on Dugar's blood. First, Dugar claims the State presented no evidence to prove the blood Dugar gave the nurse "was properly preserved or collected for forensic analysis." Second, Dugar contends the State failed to show the nurse followed the "procedures to establish a reasonable and proper blood draw" occurred since the nurse did not testify in Dugar's trial. Third, Dugar argues the State failed to prove that Officer Pratt took the vials containing Dugar's blood directly to the lab. Dugar concludes that without evidence showing how the blood got from a locked refrigerator to the lab, the State

failed to establish a proper chain of custody exists between the blood Dugar gave the nurse and the blood tested four months later in the lab.

Dugar's complaints concern rulings admitting this evidence. We review rulings admitting evidence to determine whether an abuse of discretion occurred.[34] We turn first to Dugar's argument claiming the evidence fails to show the nurse followed proper procedures when he drew Dugar's blood. We disagree the record contains insufficient evidence describing the circumstances of the draw. Officer Pratt described how the nurse drew Dugar's blood during the trial. For instance, the officer testified that after obtaining a blood warrant, he took Dugar to a hospital where a registered nurse drew his blood. According to Officer Pratt, the nurse wiped Dugar's arm, drew his blood, and after the nurse completed the draw, the nurse gave the vials containing Dugar's blood to him. Officer Pratt sealed the vials with a stopper and placed his initials on the seals. After that, Officer Pratt placed the vials in the blood kit that the nurse used when he drew Dugar's blood. Officer Pratt explained he took the blood kit to the police department, where he placed it in a locked refrigerator in the evidence room to preserve the kit so that it could be tested later by the lab.

---

[34]*Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990) (en banc).

14

The State also called the Director of the Jefferson County Crime Lab, Emily Esquivel, to testify in Dugar's trial. Esquivel is a forensic scientist. She explained that, along with her duties as the lab director, she sometimes analyzes evidence that comes into the lab. Esquivel described the normal procedures the lab follows to preserve a sample of a person's blood. She explained the vial containing Dugar's blood contained preservatives, a solution of potassium oxalate and sodium fluoride, substances that act as a preservative and anticoagulant on blood. Esquivel also testified that from the lab's paperwork, she had no reason to believe the normal procedures were not followed in the handling of the specimen she tested of Dugar's blood.

The record does not, however, show that Officer Pratt is the person who removed the blood from the locked refrigerator and took it to the lab. But "gaps in the chain of custody go to the weight of the evidence, not admissibility" when the testimony in the trial shows what happened with evidence at the beginning and end of the chain.[35] The lab paperwork in evidence identifies the specimen tested in the lab as the specimen drawn from Dugar by the nurse.

---

[35]*Hartsfield v. State*, 200 S.W.3d 813, 818 (Tex. App.—Texarkana 2006, pet. ref'd).

15

To prove an item of evidence is authentic, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[36] Trial courts have great discretion in deciding whether an item is what the proponent claims it to be.[37] Here, there is evidence showing where the chain of custody began, with the nurse, and where it ended in the lab.[38] Dugar presented no evidence to show that anyone tampered with the vials that contained his blood. We conclude the record allowed the trial court to reasonably infer that jurors could resolve Dugar's claim questioning whether the specimen tested in the lab was a test done on his blood.[39]

We conclude Dugar's complaints about gaps in the chain of custody are matters that go to the weight of the testimony about the blood tests, not its admissibility. Dugar's second issue is overruled. Having overruled both of Dugar's issues, the trial court's judgment is

---

[36]Tex. R. Evid. 901(a); *see Druery v. State*, 225 S.W.3d 491, 503 & n.30 (Tex. Crim. App. 2007).

[37]*See Druery*, 225 S.W.3d at 503 (explaining that "[a] trial judge has great discretion in the admission of evidence at trial" when deciding whether the evidence being offered has been authenticated by the party offering the evidence in the trial); *accord Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (holding appellate courts apply liberal standards ensuring a trial court's determination is within the zone of reasonable disagreement).

[38]*See Mitchell v. State*, 419 S.W.3d 655, 659 (Tex. App.—San Antonio 2013, pet. ref'd).

[39]*See Druery*, 225 S.W.3d at 503.

16

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on January 25, 2021
Opinion Delivered April 7, 2021
Publish

Before Golemon, C.J., Horton and Johnson, JJ.

17